Butter-Nut Foods Co. (Successor to Penndale, Inc.) v. Commissioner.
Butter-Nut Foods Co. v. Commissioner
Docket No. 3199-62.
United States Tax Court
T.C. Memo 1965-285; 1965 Tax Ct. Memo LEXIS 46; 24 T.C.M. (CCH) 1588; T.C.M. (RIA) 65285; October 27, 1965
Donald H. Erickson and Deryl F. Hamann, for the petitioner. James T. Finlen, Jr., for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined deficiencies in the income taxes of Penndale, Inc., for the fiscal years ended February 28, 1959, and February 29, 1960, in the respective amounts of $31,793.08 and $19,452.55. Petitioner admits being the successor to Penndale, Inc., by merger and change of name and agrees that it is liable as transferee for any deficiency determined herein. The sole issue for decision is whether any portion of a $350,000 payment to William S. Scull, II, and four other stockholders of petitioner in a transaction, purporting to be a sale of stock and securities of petitioner, constituted consideration paid to William S. Scull, *47 II, for the cancellation of his employment contract with petitioner. Findings of Fact Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Penndale, Inc. (hereinafter sometimes referred to as Penndale), was incorporated in New Jersey on February 5, 1951, under the name Jet, Inc. Penndale's certificate of incorporation provided, among other things, that all stockholders would have a preemptive right of subscription to shares of stock of the corporation and for cumulative voting in the election of directors of the corporation. Its principal place of business was at Lansdale, Pennsylvania, where it engaged in the manufacture and sale of instant (soluble) coffee. Penndale filed corporate income tax returns for the fiscal years ended February 28, 1959, and February 29, 1960, with the district director of internal revenue at Philadelphia, Pennsylvania. Penndale was an accrual basis taxpayer reporting on a fiscal year basis ending on the last day of February. On May 1, 1961, Penndale was merged into Paxton & Gallagher Co., a Delaware corporation (the successor to Paxton & Gallagher *48 Co., a Nebraska corporation), with its principal place of business in Omaha, Nebraska. On May 19, 1961, the name of Paxton & Gallagher Co. was changed to Butter-Nut Foods Co., the petitioner in this case. William S. Scull, II (hereinafter sometimes referred to as Scull), was one of the original incorporators, a substantial stockholder and a director of Penndale. He served as president of the company from its incorporation until March 24, 1959. On February 28, 1951, Scull entered into a contract of employment with Jet, Inc., which provided, in part, as follows: WHEREAS the Company is about to engage in the business of manufacturing and selling coffee extract and frozen concentrate and other commodities; and WHEREAS Scull has had long experience in the manufacture and sale of coffee and similar commodities and desires to enter into an agreement for full time employment with the Company: NOW, THEREFORE, in consideration of the mutual promises herein contained, and intending to be legally bound, the parties agree as follows: 1. Company agrees to employ Scull and Scull agrees to devote his full time, energy and attention to the work of the Company in such capacity as the Board *49 of Directors of the Company shall designate. 2. As compensation for his services, Scull shall receive from the Company a salary at the rate of Twenty Thousand ($20,000.00) per year, and in addition thereto shall receive amounts equal to the following: 10% of the net profits of the Company from $50,000 to $100,000. 15% of the next [net] profits of the Company from $100,000 to $200,000. 5% of the net profits of the Company in excess of $200,000; provided, that in no event shall Scull's aggregate compensation, including both salary and participation in profits, exceed the sum of $100,000 in any one year. The term "net profits" as herein used shall mean the gross income of the Company less all expenses incident to the operation and maintenance of the Company and its property, including a reasonable allowance for depreciation of the Company's properties, and all taxes and rentals on its properties and plants, and all interest on the obligations of the Company, but without deduction of taxes levied upon the income of the Company. 3. This agreement shall become effective immediately upon execution, except that the salary and other compensation of Scull shall not begin until *50 April 1, 1951. This agreement shall continue in effect for a period of ten (10) years from April 1, 1951, and thereafter shall continue from year to year upon the same terms and conditions, unless either party shall give to the other written notice of intention to terminate the contract at least ninety (90) days prior to the conclusion of the original term hereof, or any renewal thereof. During 1956 Penndale entered into a contract to supply instant coffee to Paxton & Gallagher Co. (hereinafter sometimes referred to as Paxton), the Nebraska corporation. Under the terms of this contract Penndale was to expand its plant, equipment, and facilities to enable it to supply Paxton with a minimum of 400,000 and a maximum of 1,500,000 pounds of instant coffee per year. Paxton was to loan or secure funds, up to a maximum of $450,000, as required by Penndale to finance its expansion. If necessary, additional funds were to be furnished Penndale by the Donner Foundation, Penndale's largest stockholder. Among other things, the contract gave Paxton an absolute right of cancellation, after 3 years, upon 90 days notice and payment of a sum of money. On January 15, 1959, all of the assets of Paxton *51 were sold to a newly organized corporation, Paxton & Gallagher Co. (sometimes referred to herein as P and G), the Delaware corporation. All of the assets and liabilities of the Nebraska corporation were assumed by the Delaware corporation, including the 1956 contract with Penndale. Penndale encountered production difficulties in the operation of its expanded plant. L. W. McBride, vice president and general manager of Paxton attributed Penndale's production difficulties to poor management. He contacted Robert A. Maes of the Donner Foundation, Scull, president of Penndale, and E. C. Gillingham, vice president of Penndale, in his attempts to secure added production from Penndale. During 1957 disagreements regarding the management of Penndale arose between Scull and Robert A. Maes. These difficulties increased as time went on. During January 1958 the board of directors of Penndale established an executive committee to run Penndale. The committee consisted of Scull, Earle Selby, and E. C. Gillingham, the latter two being employees of Penndale who answered to Robert A. Maes. The members of the committee had equal powers in the management of Penndale and reported to Maes once a week. *52 In February 1959 Penndale had 58,752 shares of common stock outstanding. In addition, its stockholders had options (sometimes referred to as option rights) to purchase 22,250 shares of common stock at $5 per share and 1,000 shares of common stock at $2.50 per share, as set forth in the following tabulation: $5
$2.50
Stockholder
Common
Opt.
Opt.
Donner Foundation
29,260
6,650
299
Kirsopp
2,750
625
28
Kidder, Peabody & Co.
1,987
4,515
203
Scull
16,761 *
8,960
403
A. D. Little Foundation
2,900
600
27
Burge
1,100
250
11
Vulcan
1,000
Goodman
1,000
200
9
Irwin
1,330
300
14
Laughlin
330
75
3
Weiser
330
75
3
Maes
1
Ranck
1
Gillingham
1
Selby
1
On February 25, 1959, Paxton, acting through W. Clarke Swanson and Associates of Omaha, Nebraska, contracted with the Donner Foundation to purchase its 29,260 shares of common stock of Penndale for $10.0808 per share and its 6,949 options for $1 per option. By the same contract, Paxton also acquired $606,000 principal amount of outstanding indebtedness of Penndale from the Donner Foundation. *53 The contract also provided, in part, that the Donner Foundation would: use its best efforts and influence to cause Kidder, Peabody & Co., C. B. Kirsopp and such others of the stockholders and option holders of Penndale, Inc., with respect to which Seller has influence, to sell their stock and options in Penndale, Inc., to Buyers at the same basis as the Seller is selling its stock and options to the Buyers. The Buyers shall have the right to declare this Agreement null and void in the event the Seller is unable to cause Kidder, Peabody & Co., and C. B. Kirsopp to sell their stock and options to the Buyers. The contract provided for consummation of the sale on May 15, 1959, and it was so consummated. Paxton paid approximately $1,000,000 for the stock, options, and outstanding indebtedness. By letters dated March 19, 1959, Cecil A. Johnson (hereinafter sometimes referred to as Johnson), general counsel and tax and business advisor to Paxton and W. Clarke Swanson and Associates, advised Scull and the other remaining minority shareholders of Penndale of Paxton's contract to purchase the Donner Foundation's common stock and options. Johnson's letters offered to purchase the minority *54 shareholders' common stock at $10.0808 per share and options at $1.00 per option. The letters further provided that the offers had to be accepted on or before March 31, 1959. Of the remaining minority stockholders, the Arthur D. Little Foundation, Eleanor L. Burge, E. Budd Laughlin, and Aaron Weiser (hereinafter, together with Scull, sometimes referred to as the Scull group), none of whom are related to Scull or was an employee of Penndale, joined with Scull for the purpose of negotiating for the sale of their stock. They authorized Bernard Eskin, [1] an attorney, to act on their behalf in dealing with Paxton and Swanson. Upon the advice of Eskin, the offer of March 19, 1959, was rejected by the Scull group as inadequate. During the early part of 1959, Scull became interested in a secret process developed by J. J. Martinat, a flavor chemist, to remove oil soluble aromatics from coffee and other substances which could be added back to instant coffee to make it taste *55 more like regular coffee. Scull advanced $5,000 for research work by Martinat with the expectation that Penndale might buy the process or output from it. At about the same time, Scull also became interested in other ventures, particularly a vacuum dehydrator designed and built by the Chain Belt Company. Vacuum dehydrators were the principal pieces of equipment used by Penndale. It was Scull's judgment that Penndale should buy the patents and assets of the Chain Belt Company relating to its dehydrator to increase Penndale's effectiveness in the market and improve the exclusiveness of its process. On March 24, 1959, Scull was relieved of his duties as president of Penndale. By letter dated April 6, 1959, L. W. McBride, who was the newly appointed executive vice president and general manager of Penndale, advised Scull that he was to retire from the day-to-day operation of the company but continue his association with the company as a consultant. Scull again sought the advice of Bernard Eskin because it appeared to him that his situation with Penndale was becoming difficult. Eskin, who was aware of Scull's interests in other ventures, cautioned Scull that, because of his employment contract *56 with Penndale, he was on dangerous ground in interesting himself in ventures outside Penndale and that such action might be considered a breach of his employment contract. Further, Eskin advised Scull that, if the ventures proved successful, there might be a claim that the profits belonged to Penndale. Eskin assisted Scull in preparing a letter to L. W. McBride stating his willingness to comply with the terms of his employment contract. The letter reads, in part, as follows: I acknowledge receipt of your letter of April 6, and while I am still not very clear as to what is expected of me, I will do the best I can to perform such services for Penndale as I am called upon to perform. So that there will be no misunderstanding about it, I hold myself in readiness to perform such services as the Board of Directors of Penndale shall designate in strict accordance with my employment contract dated February 28, 1951, and I will, of course, expect to be compensated in accordance with that contract. There are a number of other matters with which you are fully familiar and which I think should be called formally to the attention of the present management. As you know, I have been working *57 for some time in cooperation with an inventor who has developed a process for extraction of coffee flavoring which I think would be highly useful in the instant coffee business. The present status of the matter is that Steve Chambers and I hold an option to acquire an interest in this process. The option will expire on April 26, 1959. If the option is to be taken up, it will require an expenditure of approximately $150,000 to build a plant and exploit the secret formula. This entire matter has previously been brought to the attention of the Board of Directors of Penndale and it was expressly rejected as an investment for Penndale. However, in view of the change of management, I thought it appropriate to bring the matter to your attention. I would like to know very promptly whether Penndale is interested in this proposition, including the necessary investment of funds, or in the alternative whether Penndale would be interested in entering into a contract for the production of the oil extract. In view of the short time remaining for exercise of the option, any decision to be made by Penndale must be made immediately. The next matter which I would like to call to your attention involves *58 the acquisition of the patents and other assets of Chain Belt Company relating to its dehydrator. This proposal will involve an investment of approximately $500,000 over a period of several years. I would like to know as promptly as possible whether the present management of Penndale is interested in such a proposal. McBride advised Scull that Penndale was not interested in investing $150,000 in the Martinat process without knowing more about it and was not interested in the Chain Belt Company's dehydrators. Alexander Barbieri, an attorney located in Philadelphia, Pennsylvania, became secretary and general counsel of Penndale on or about March 24, 1959. He also engaged in negotiations with the Scull group with respect to the purchase of their Penndale stock, acting on behalf of Paxton and W. Clarke Swanson Associates. In these negotiations he receive instructions from Johnson. On May 11, 1959, Barbieri, pursuant to a May 4, 1959, query by W. Clarke Swanson, the new president of Penndale, rendered an opinion that the option rights were void because they had not been authorized by Penndale's corporate charter as required by New Jersey law. By letter dated May 19, 1959, Barbieri *59 advised the minority stockholders who owned these options of his opinion and that Penndale's board of directors had instructed him to apply for a judicial determination as to the validity of the option rights. On May 19, 1959, Barbieri brought suit on behalf of Penndale against Scull in the United States District Court for the Eastern District of Pennsylvania to have the validity of the options determined. The suit was eventually dismissed on July 28, 1959, because, in the interim, Paxton had acquired the outstanding stock and options of the minority stockholders. By letters dated May 20, 1959, Johnson, on behalf of Paxton, renewed the offer of March 19, 1959, to purchase the stock and options held by the Scull group and also to purchase any debentures of Penndale held by them. The offer expired on June 15, 1959, without being accepted. Through its acquisitions from the Donner Foundation, and through other acquisitions from other stockholders on the same basis as the purchase from the Donner Foundation, Paxton had acquired, by May 31, 1959, 37,327 shares (or approximately 63 percent) of the 58,752 shares of issued and outstanding common stock of Penndale and 12,843 options to purchase *60 common stock of Penndale (or approximately 50.37 percent) of the 25,498 options then outstanding. Common stock and options to purchase common stock of Penndale outstanding as of May 31, 1959, other than those owned by Paxton were held by minority shareholders as follows: Common
$5.00
$2.50
Owner
stock
Options
Options
E. H. Selby
1
999
0
E. C. Gillingham
1
749
0
W. R. Saltmer
0
500
0
William S. Scull, II
16,763
8,960
403
A. D. Little Foundation
2,900
600
27
E. Budd Laughlin
330
75
3
Eleanor L. Burge
1,100
250
11
Aaron Weiser
330
75
3
Totals
21,425
12,208
447
Sometime during May 1959 Eskin met with Johnson and Barbieri. They renewed Johnson's previous offer to purchase the stock interests of the Scull group at $10.0808 per share at $1 per option. Eskin rejected the offer since it had been previously rejected and instead requested a price of $15 per share of stock. No agreement was reached at that meeting. Johnson also instructed Barbieri to negotiate with Eskin regarding certain patents, debt obligations of Penndale, Scull's employment contract, a restrictive covenant on Scull's future activities and the common stock *61 and options of Penndale, but informed him that he was to adhere to a price of $10.0808 per share of stock and $1 per option. Johnson authorized Barbieri to offer $60,000 for the employment contract between Scull and Penndale. This authorization was subsequently raised to $130,000. On May 17, 1959, Scull went to Europe and did not return until the following July. Before leaving, Scull gave Eskin complete authority to negotiate on his behalf with Barbieri regarding his stock, options and employment contract. It was Scull's desire to obtain a release from his employment contract because of his interests in other ventures and he discussed this with Eskin. Securing Scull's release from his employment contract was one of Eskin's objectives in his negotiations with Barbieri. By letter dated June 6, 1959, E. Budd Laughlin wrote Cecil A. Johnson in reference to the offer contained in Johnson's letter of May 20, 1959. Laughlin's letter reads, in part, as follows: When the annual meeting is rescheduled I still want to talk about selling out to your clients or finding out what the future of the company will be if I remain a stockholder with them. I am an original investor in this enterprise *62 and it was never my intention to sell my stock, particularly now when the company is beginning to show some real progress. However I do not wish to be in the middle of a fight. As we both know the interest of the two groups of stockholders may not be compatible. If you agree on this point I still believe a joint meeting, with all the minority stock represented, can be arranged and a satisfactory solution negotiated. Johnson, by letter dated June 10, 1959, advised Laughin that the offer to purchase his interests was the same as that made the Donner Foundation and all other stockholders. Johnson's letter further stated, in part: There may be one or more stockholder who believe their minority interests represent a value greater than that paid to the Foundation, and of course that view would be personal and therefore would not conform to the view of W. Clarke Swanson and Associates. I suspect that your offer to negotiate has in it the anticipation and hope that a greater price per share would be paid for minority interests at this time, however, there is no intention on the part of W. Clarke Swanson and Associates to negotiate with respect to such an objective. The price as offered *63 is not only fair, but generously fair. Again, thanks for your offer to be of assistance to us and we hope that you will see fit to dispose of your stock to us in the manner as our offer was presented. While Scull was in Europe, Eskin and Barbieri negotiated on behalf of their respective interests. Barbieri requested a covenant restricting Scull from entering the coffee business in a prescribed area. Since most of Scull's interests were in the coffee business, Eskin advised Barbieri that under no circumstances would he agree to such a provision. Scull's employment contract and the patents were also discussed in the negotiations, but no agreement was reached as to any specific amount for any particular item. Rather, the parties negotiated in terms of a gross price to be paid. Johnson was aware that the negotiations were conducted on a lump-sum basis. Barbieri offered $300,000 and later $325,000; both figures were rejected and Eskin finally suggested $350,000 which was accepted by Barbieri on behalf of Paxton a few days prior to July 3, 1959. There were no discussions between Eskin and Barbieri regarding an allocation of the ultimately agreed upon sales price of $350,000. Eskin *64 prepared a draft of an agreement reflecting the sale of the Scull group's interests in Penndale, which he enclosed with a letter to Barbieri, dated July 3, 1959, which reads as follows: I enclose original and three copies of a draft agreement for the sale of the Penndale securities by Mr. Scull and the other minority shareholders to Paxton & Gallagher Co. Will you be good enough to review it and let me have any comments that occur to you. If it seems satisfactory to you, I suggest that you forward the enclosures to Mr. Johnson with a request that the agreement be executed on behalf of Paxton & Gallagher Co. In view of the fact that Bill Scull is expected back here on July 13 which is only another week, it seems to me that it would be advisable to wait for his return and get his signature on this agreement, rather than proceed with the delivery of stock prior to his return. Time, of course, will be saved if you could get your client to execute the agreement in advance. You will note that I have fixed the date of settlement for July 17. Since I expect to have all of the securities in my hands, with executed assignments in blank, there should be no difficulty in our completing *65 settlement promptly after the agreement has been signed. Upon receipt of the proposed agreement Barbieri, who was not experienced in tax matters, contacted Johnson. Barbieri told Johnson that he thought the agreement had tax implications. Johnson, an experienced tax advisor, advised Barbieri that the substance of the transaction would prevail over its form and that he did not want to interfere with the drafting of the agreement. Johnson purposely avoided making any changes in the contract. The agreement was executed on behalf of Paxton by Gilbert C. Swanson and was sent to Eskin for signature. The agreement, dated July 14, 1959, was executed by Scull on behalf of the Scull group. The agreement provides, in part, as follows: 1. Seller agrees to sell and deliver to Buyer and Buyer agrees to purchase the following securities of Penndale, Inc., presently issued and outstanding in the names of the individuals and in the amounts as indicated: Options to pur-
4 1/2% Ten
Four year 5%
Name
Shares
chase shares
year notes
debentures
Original principal
amount
Wm. S. Scull
16,763
8,960
None
None
The A.D.L. Foundation
2,900
600
None
None
E. Budd Laughlin
330
75
$ 3,000
None
Eleanor L. Burge
1,100
250
10,000
$5,000
Aaron Weiser
330
75
3,000
None
Totals
21,423
9,960
$16,000
$5,000
*66 2. As the purchase price for the foregoing securities Buyer agrees to pay to Seller the sum of $350,000 in cash at settlement, as hereinafter provided. 3. Settlement shall take place on Friday, July 17, 1959, at 10:00 A.M. in the office of Alexander F. Barbieri, Esquire, attorney for Buyer. 4. At settlement: (a) Seller shall deliver to Buyer: (i) Certificates representing all the shares of stock to be sold hereunder, accompanied by appropriate assignments to Buyer. (ii) Instruments evidencing the options to purchase stock sold hereunder accompanied by appropriate assignments to Buyer. (iii) The notes to be sold hereunder accompanied by appropriate assignments to Buyer. (b) Buyer shall pay to Seller the sum of $350,000 by certified check to Seller's order. (c) Seller shall deliver to Buyer instrument executed by Seller acknowledging that Penndale Inc. has no further obligations to Seller under a certain agreement dated February 28, 1951, that said contract is cancelled and the employment thereunder is terminated as of the date of settlement, and generally releasing Penndale Inc. from any and all obligations of any nature to Seller. (d) Buyer shall deliver to Seller *67 instrument executed by Penndale Inc. acknowledging that Seller has no further obligation to Penndale Inc. under the said agreement dated February 28, 1951, that the said agreement is cancelled and Seller's employment thereunder is terminated as of the date of settlement, and generally releasing Seller from any and all obligations of any nature to Penndale, Inc. Pursuant to the agreement of July 14, 1959, settlement took place at 10 a.m. on July 17, 1959. At that time Paxton remitted the unpaid balance of $325,000 due under the agreement, Scull resigned as an officer of Penndale, and the securities evidencing the Scull group's interests in Penndale were turned over to Barbieri. While the contract of sale does not refer to the options to purchase Penndale's stock at $2.50 per share, it was understood between the parties that the Scull group would not retain these options. Also at settlement, Penndale and Scull executed an agreement terminating their employment contract of February 28, 1951. Said agreement provides, in part, as follows: Scull has heretofore been employed by Penndale, under an agreement dated February 28, 1951, which agreement was to continue in effect until February 28, 1961. *68 Scull has also heretofore served Penndale in various capacities, including a membership on the Board of Directors and as President of the corporation. The parties now desire to sever their relationship, to terminate the employment under the said contract and to exchange mutual releases. NOW, THEREFORE, the parties hereto in consideration of the mutual promises herein contained and intending to be legally bound, agree as follows: 1. The contract of employment dated February 28, 1951, between the parties is hereby cancelled and terminated as of the date hereof. 2. Penndale acknowledges that as of the date hereof it has no claims of any nature against Scull and Penndale hereby releases Scull from any and all obligations of any nature which may exist. 3. Scull acknowledges that as of the date hereof he has no claims of any nature against Penndale and Scull hereby releases Penndale from any and all obligations of any nature which may exist. Eskin computed the portion of the $350,000 sales proceeds each member of the Scull group was to receive by first deducting his fee of $10,000 and the principal debt obligations which totaled approximately $15,000. The balance of $325,000 was *69 apportioned among all the members of the Scull group in proportion to their holding of common stock and options. By trial and error, Eskin arrived at a value of $12 per share of stock and $7 per option. In arriving at these figures, there was a deficiency of a few hundred dollars which Eskin, with Scull's consent, deducted from Scull's share of $262,800. Eskin's calculations did not include any factor for Scull as a result of the termination of the contract of employment between Scull and Penndale. By letters dated July 17, 1959, Eskin remitted $6,225 to Aaron Weiser, $6,225 to E. Budd Laughlin, $25,750 to Eleanor L. Burge, and $39,000 to Frank N. Houghton, secretary of the Little Foundation. The letter to Eleanor L. Burge, which is typical of all the letters, reads, in part, as follows: The settlement for the sale of the Penndale stock took place today (Friday). I have discussed with Mr. Scull the appropriate method of apportioning the total purchase price of $350,000 among the various minority shareholders. Of course, the outstanding notes will be paid first. These amount to $14,280, in total, so that the net amount for distribution to shareholders is $335,720. Mr. Scull and *70 I concluded that the appropriate method of distributing this amount among the shareholders is to value the stock at $12.00 per share including a value of $7.00 per share for the $1.00 [sic $5.00] options. On this basis there will be a small amount in excess of $12.00 per share which will be used to defray the costs involved in the transaction including counsel fee. Mr. Scull wanted me to say to you that any counsel fees involved beyond this amount will be absorbed by him. I trust the foregoing is satisfactory to you and in accordance with this plan you will find enclosed check in the amount of $25,750.00 made up as follows: 4 1/2 Note - reduced principal
amount
$ 5,800.00
5% Note
5,000.00
1100 shares at $12.00
13,200.00
250 options at $7.00
1,750.00
TOTAL
$25,750.00
Incidentally, the amount received by you for the stock and options is $3,700 more than you would have received under the original offer of Paxton & Gallagher. The board of directors of Penndale held a meeting on the afternoon of July 17, 1959. The minutes of this meeting reflect the following resolution: Resolved that the company purchase the employment contract of William S. Scull *71 dated February 28, 1951, which agreement under its terms would have continued in effect until February 28, 1961, for the price of $109,352.02, and Paxton and Gallagher Company (a Delaware Corporation) is hereby authorized to make purchase of the said contract and to make charges therefor against Penndale, Inc. In accordance with the resolution, Penndale accrued $109,352.02 as an expense on its books for the fiscal year ended February 29, 1960. In its income tax return for the taxable year ended February 29, 1960, Penndale reported a net loss of $61,184.84, after deducting $109,352.02 which it attributed to the cancellation of its employment contract with Scull. Scull did not receive an Information Return (Form 1099) from Penndale or from Paxton advising him that any portion of the total consideration paid pursuant to the agreement of July 14, 1959, was being treated as payment for his employment contract. In their joint income tax return for the taxable year 1959, Scull and his wife reported a long-term capital gain of $236,759.23 from the sale on July 17, 1959, of 16,763 shares of Penndale stock, showing a sales price of $262,800 and cost of $26,040.77. Ultimate Finding No *72 part of the $350,000 paid by Paxton & Gallagher Co., pursuant to the agreement of July 14, 1959, constituted consideration for the cancellation of the contract of employment between William S. Scull, II, and Penndale, Inc. Opinion The issue before us is basically factual. Petitioner contends that $109,352.02 of the $350,000 received by the Scull group from Paxton was consideration for the cancellation of Scull's employment contract. Respondent, on the other hand, contends that none of the $350,000 is allocable to the employment contract, but rather that the entire sum was consideration for the stock, the stock option rights, and the outstanding indebtedness of Penndale transferred by the Scull group to Paxton. We have already decided the proper tax treatment of the sums received by Scull in this transaction. See William S. Scull, II, T.C. Memo. 1964-224 (August 25, 1964). The material facts are substantially the same in this case. Most of the evidence and many of the witnesses were the same in both cases. In the Scull case respondent took the position, inconsistent with that taken here, that part of the amount received by Scull was allocable to the cancellation of *73 his employment contract and, to the extent so allocable, was ordinary income rather than capital gain. In the Scull case we found as a fact that none of the $350,000 purchase price was allocable to the employment contract and allowed Scull capital gains treatment on the entire amount received by him. Upon consideration of the agreement of July 14, 1959, and all the evidence before us in this proceeding, we again conclude and have found as a fact that no part of the $350,000 represented consideration paid to Scull for the cancellation of his employment contract with Penndale. The agreement of July 14, 1959, specifically states that the sum of $350,000 is the purchase price of the various securities. It is true that the agreement provided for the cancellation of the employment contract and the signing of mutual releases from the obligations of the employment contract by Penndale and Scull. However, the agreement does not provide for any consideration for the cancellation of the employment contract other than the signing of the releases. At the trial of this case we received substantial evidence with respect to the negotiations culminating in the agreement of July 14, 1959, for the *74 purpose of determining whether the agreement reflected the substance of the transaction. We are convinced that it did. The evidence shows that Paxton twice offered to pay the Scull group $10.0808 per share and $1 per option right and was turned down each time, the Scull group demanding $15 per share. The same offer was made a third time during the negotiations leading to the July 14 agreement and was again refused. It is clear that there never was a meeting of the minds as to specific prices for the shares of stock and option rights. There were discussions regarding cancellation of the employment contract and the signing of mutual releases. However, we are satisfied that there was no meeting of the minds with respect to the allocation of part of the purchase price to cancellation of the employment contract. Because of their inability to agree on specifics, Eskin and Barbieri negotiated on the basis of a lump sum payment. We think it is significant that there is no consideration stated for cancellation of the employment contract except the signing of mutual releases. It is apparent that Paxton wanted Penndale relieved of the obligation to pay Scull $20,000 a year plus a percentage *75 of the profits. But it is equally apparent that Scull wanted to be released from his employment contract so that he could freely engage in other ventures. On July 3, 1959, Eskin sent a draft of the agreement to Barbieri requesting that Barbieri review it and advise him of any proposed changes. Barbieri realized that the agreement had certain tax implications and, after consulting with Johnson, it was decided that no changes would be made. The inference readily drawn from their actions is that Barbieri and Johnson were aware that if they amended the agreement to alter its tax consequences the sale might fall through. Barbieri and Johnson, by their silence, acquiesced in the obvious tax implication of the July 14 agreement, thus adopting, as their own, Eskin's intent in drafting the agreement. In other words, the contemplated tax results were actually part of the bargain. Under these circumstances we are unwilling to rewrite the clear and unequivocal terms of the agreement which we think accurately reflects the intent of the contracting parties at the time of its execution. As the Court of Appeals said in Annabelle Candy Co. v. Commissioner, 314 F. 2d 1 (C.A. 9, 1962), *76 affirming a Memorandum Opinion of this Court: (p. 6) It is true, as the Tax Court found, that the covenant not to compete played a very real part in the negotiation of a final contract between the parties, and was a valuable benefit to the petitioner. But if the parties did not intend that a part of the purchased price be allocated to this important and valuable covenant, that intention must be respected. Unless respected, the tax consequences which they contemplated as incident to the benefits and burdens of the contract would be disturbed. Here the parties, fully cognizant of the tax implications, intended the agreement to read precisely as it does. It is of no consequence that Barbieri and Johnson may have had a secret, unexpressed hope that the Commissioner of Internal Revenue would ignore the form of this carefully negotiated agreement and rewrite it as they would have preferred had they succeeded in their negotiations. The manner in which the $350,000 received by the Scull group was distributed further supports our finding that the entire purchase price was, in reality, paid for the stock, option rights, notes, and debentures. We repeat what we said in William S. Scull, II, supra: *77 In making the distribution of the $350,000 Scull and Eskin did not treat any portion of the amount as being received for the cancellation of the employment contract. Indeed, under the terms of the agreement of July 14, 1959, the other members of the Scull group could have prevented the petitioner [Scull] from appropriating to himself any greater amount than his proportionate share based upon his stock ownership. The full amount of $350,000 was treated by the Scull group as consideration for the stock, stock options, and obligations of Penndale, each member of the group receiving his proportionate share based on his ownership of the securities, after the payment of an attorney's fee. Actually, the petitioner received a slightly lesser portion, based on his stock ownership, than did the other members of the group. The resolution of Penndale's board of directors, wherein they unilaterally attributed $109,352.02 to the cancellation of Scull's employment contract and authorized Paxton to purchase the contract and make charge therefor against Penndale, was not adopted until July 17, 1959, three days after the agreement of July 14, 1959, and more than two weeks after Eskin and Barbieri *78 had agreed on the lump-sum purchase price of $350,000. We believe it is also important that Penndale did not furnish Scull, pursuant to section 6041 of the Internal Revenue Code of 1954 and the regulations thereunder, with an Information Return (Form 1099) advising him that they were treating $109,352.02 of the $350,000 as a payment for his employment contract. While this fact alone is not dispositive of the issue before us, it is another factor indicating that the actions of Penndale and Paxton were entirely unilateral and were not the result of an agreement between the parties that any part of the purchase price was allocable to the cancellation of the employment contract. Petitioner introduced evidence for the purpose of showing the "true" value of the Penndale stock. Having found that the July 14, 1959, agreement accurately reflected the intention of the parties at the time of its signing, it is unnecessary for us to discuss this evidence other than to say that we do not find it convincing. Accordingly, Decision will be entered for the respondent. Footnotes
*. Scull acquired 2 additional shares sometime prior to July 14, 1959.↩
1. Bernard Eskin was secretary and general counsel of Penndale from its incorporation until early in 1959. He was succeeded in that capacity on or about March 24, 1959, by Alexander F. Barbieri, another attorney.↩