T.C. Memo. 1998-281


UNITED STATES TAX COURT


LORVIC HOLDINGS, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 3408-97, 15611-97.        Filed August 4, 1998.


<u>John P. Barrie</u>, <u>Dana Lasley</u>, and <u>Elizabeth Ann Smith</u>,
for petitioner.

<u>Robert J. Burbank</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


HAMBLEN, <u>Judge</u>:  Respondent determined the following
deficiencies in petitioner's Federal income tax:

| Taxable Year | Deficiencies |
|--------------|--------------|
| 1992 | $204,000 |
| 1993 | 204,420 |
| 1994 | 204,321 |
| 1995 | 153,329 |

The issue for consideration is whether, for purposes of section 167, the aggregate fair market value of the 5-year covenant not to compete and the secrecy agreement is $3 million as claimed by petitioner on its corporate Federal income tax returns.[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Petitioner, Lorvic Holdings, Inc., is the parent of the Lorvic Corp. (New Lorvic), and in turn, New Lorvic is the corporate successor to certain assets of the Lorvic Corp. (Old Lorvic). Petitioner is a Delaware corporation, whose principal offices are located in Earth City, Missouri. Old Lorvic was engaged in the development, design, manufacturing, marketing, distribution, and sale of a variety of health care products for the professional dental market. In general, the company

---

[1]The notice of deficiency contains adjustments to petitioner's environmental tax for the 1993, 1994, and 1995 tax years. This adjustment is a computational adjustment which rests on the Court's determination of the foregoing issue in this case.

segmented its product offerings into four broad classifications: (a) Preventive, (b) oral evacuation, (c) infection control, and (d) miscellaneous. Old Lorvic offered more than 60 items, including, but not limited to, fluoride gels, solutions, prophylaxis paste, applicator trays, aspirator instruments, sterile tubing, and tofflemire bands. Old Lorvic supplemented each product classification with private label business for several major dental manufacturers. Many of the company's products were relatively simple to fabricate and were disposable in nature. Moreover, most of the foregoing items were not patented. In that regard, the company operated a manufacturing plant in St. Louis, Missouri.

Old Lorvic actively pursued and developed specific niche markets which major dental manufacturers either overlooked or had not emphasized because the overall size of such markets was not of sufficient magnitude to make it profitable for the larger companies to pursue. On the other hand, Old Lorvic's structure enabled it to exploit these niches and command high profit margins. Old Lorvic utilized a complex network of dental product dealers to distribute its products to dental professionals. In that regard, Old Lorvic's primary sales occurred in the United States, while Canada comprised the largest foreign market for the company's products.

In 1954, Charles Nemanick acquired an interest in Old Lorvic, and assumed managerial responsibilities. At some point, Charles Nemanick and family members acquired a controlling interest in the company. In 1979, Old Lorvic acquired Scientific Associates, Inc. (SAI), a contract testing laboratory in St. Louis, Missouri, which had been providing a certain amount of services to Old Lorvic. SAI was thereafter operated as a separate stand-alone business.

In March 1985, R.P. Scherer Corp. (Scherer), an international developer of drug delivery systems and the world's largest producer of softgels for the pharmaceutical and nutritional supplements industries, acquired Old Lorvic. After the acquisition, Old Lorvic continued to operate, in practice, as an autonomous business. At the time of purchase, Scherer was diversifying in order to expand its domestic earnings base. In the foregoing transaction, Scherer paid approximately $5.8 million for the outstanding stock of Old Lorvic. Scherer, however, did not prepare a valuation of the assets it had acquired through Old Lorvic.

The Stock Purchase Agreement (1985 Agreement) incorporated a covenant not to compete from Charles Nemanick and his son, Richard S. Nemanick (Richard Nemanick). Specifically, Article XIV of the 1985 Agreement declared:

Section 14.1 <u>Covenant Not to Compete</u>.  Each of the Principal Stockholders covenants and agrees that commencing with the Effective Date and continuing for a period of five (5) years or until the expiration of three (3) years following the termination of any Employment Agreement between [Scherer] as the surviving corporation and a Principal Stockholder, whichever is later, such Principal Stockholder shall not anywhere in the United States and Canada, directly or indirectly, by or for themselves or as the agent of another or through others as their agent:

> (a) promote, sell, license, distribute or otherwise deal in products or services which are in competition with those of [Scherer] or any of its subsidiaries;
> (b) own, manage, operate, be compensated by, participate in, render advice to, have any right to or interest in any business directly or indirectly engaged in the design, production, sale or distribution of products or services directly competitive with [Scherer] or any of its subsidiaries; or
> (c) solicit or accept any business from customers of [Scherer] or any of its subsidiaries for products or services directly competitive with those of [Scherer] or any of its subsidiaries, or request, induce or advise customers of [Scherer] or any of its subsidiaries to withdraw, curtail or cancel their business with [Scherer] or any of its subsidiaries.
> *    *    *    *    *    *    *

Section 14.4  <u>No Consideration Paid for Covenant</u>.  [The parties] each recognize and agree that the entire consideration passing to the Stockholders pursuant to the Merger represents and constitutes the fair market value of the shares of Lorvic Stock, and that no portion thereof represents payment for the covenants not to compete by the Principal Stockholders set forth in Section 14.1 or in the Employment Agreements attached hereto * * *  For federal and state income tax purposes neither [of the parties] will treat any portion of such consideration as representing payment for said covenants not to compete.

The 1985 Agreement also incorporated an unsigned, and undated, exclusive Employment Agreement with Charles Nemanick, who, at the date of the 1985 transaction, was the chairman and president of Old Lorvic.  Scherer, through its new subsidiary, sought to retain Charles Nemanick "so that the experience and management ability" would continue to be available to Old Lorvic.  Subsequent to the 1985 acquisition, several employees of Old Lorvic departed the company and were not, at any point, employed by Scherer.

Charles Nemanick managed and operated Old Lorvic until his death in 1986.  Following Charles Nemanick's death, his son Richard Nemanick, and Charles' wife assumed the positions of president and chairman, respectively.  Richard Nemanick possessed substantial experience with the company.  Specifically, he joined Old Lorvic in 1969, holding various positions throughout the company.  In that regard, he was responsible for marketing, manufacturing, acquisitions, and product development.

Old Lorvic was one of Scherer's profitable subsidiaries. In that time frame, Old Lorvic earned, before taxes, annual profit margins of approximately 40 percent.  In particular, Old Lorvic's Nyclave product which was a nylon wrap, was one of the principal products in terms of sales volume.  Old Lorvic

controlled approximately 90 percent of the Nyclave market. Also, Old Lorvic controlled approximately 80 percent of the market for disposable surgical aspirators, and 40 percent of the market for oral evacuators and a somewhat lesser percentage for prophylaxis paste. In that connection, Old Lorvic's major distributors accounted for more than 50 percent of its gross sales.

Throughout the period, Richard Nemanick provided the management of Scherer, on a monthly basis, with reports that detailed Old Lorvic's top 10 products, including the sales percentage change by month and year to date. Such reports included sensitive information which incorporated data on important customers, competitors, and Government regulations affecting the market. In addition, he prepared profit plans which included projections of future sales. He also prepared annual budget reports which detailed its profit margins by product line and by specific product. Richard Nemanick conducted frequent telephone conversations with representatives from Scherer and participated in company meetings at least twice a year.

In late 1989, Scherer was acquired in a leveraged buyout by Shearson Lehman Hutton Holdings, Inc. (Shearson Lehman). Subsequently, pursuant to directions from Shearson Lehman,

Scherer contemplated divesting itself of Old Lorvic because of new strategic objectives and considerations with respect to its business.

In an undated Descriptive Memorandum prepared by Shearson Lehman, it was noted that "Management feels the loyalty of its customer base is Lorvic's most significant competitive advantage in a market dominated by large corporate organizations." Moreover, the Descriptive Memorandum also recognized that "While [Old Lorvic] utilizes a dealer network for the majority of sales, senior management has built strong direct relationships with [Old] Lorvic's old customers." The Descriptive Memorandum reported that the management of Old Lorvic projected that revenues would increase in the short term. In particular, revenue was projected to be $4.1 million for the taxable year ended March 31, 1990. This figure was a 12.8-percent increase from the previous year. For the fiscal year 1992, revenues were projected to reach $5 million with $2.1 million in operating income.

Scherer offered to sell Old Lorvic to Richard Nemanick for approximately $7.5 million. At the same time, Chemical Ventures Capital Associates (Chemical Ventures), a venture capital company, in conjunction with John I. Kirtley (Kirtley), and P. Jeffrey Leck (Leck) received the Descriptive Memorandum regarding

Old Lorvic, and were interested in pursuing an acquisition of the company. Leck performed due diligence research on Old Lorvic including visiting the corporation on numerous occasions and holding indepth conversations with the officers and managers. In the process, Leck, Kirtley, Chemical Ventures, and Richard Nemanick formed petitioner and a subsidiary, LC Acquisition, to facilitate the acquisition of Old Lorvic's assets. Petitioner was capitalized as set forth below:

| Purchaser | Common Stock | Preferred Stock | Total Cost |
|---|---|---|---|
| Chemical Venture | 9,895 | 15,000 | $1,509,895.00 |
| Kirtley | 2,552.5 | 105 | 13,052.50 |
| Leck | 2,552.5 | 105 | 13,052.50 |
| Richard Nemanick | 10,000 | 900 | 100,000.00 |

In December 1989, Leck and Kirtley compiled an "Acquisition Financing Memorandum" (Acquisition Memorandum) regarding the target corporation, Old Lorvic, which noted that "senior management", as well as Leck and Kirtley, through Florida Capital Partners, Inc., had "signed a Letter of Intent to acquire the Lorvic Corp. * * *, a wholly owned subsidiary of R.P. Scherer Corp.".[2] The Acquisition Memorandum was intended, in part, to

---

[2]Kirtley and Leck were two principals and owners of Florida Capital Partners, Inc.

obtain loan amounts from financial institutions for petitioner's prospective purchase of Old Lorvic.

The Acquisition Memorandum identified and detailed specific factors as crucial to Old Lorvic's success in the dental professional field and related objectives.  Among other things, the Acquisition Memorandum stated that a great degree of Old Lorvic's attractiveness as a company for acquisition rested on increasing yearly revenues, an attractive purchase price, and significant success in its strategy of marketing to specific niches in the dental professional field.  The Acquisition Memorandum stated as factors that supported the assumption of ownership:

> (3) <u>Strong Management Team</u>.  The Nemanick family has been managing Lorvic's operations for nearly 35 years. Senior management averages more that [sic] 22 years with the Company.  While the Company utilizes a dealer network for the majority of sales, senior management has built strong direct relationships with Lorvic's direct customers.

>     *     *     *     *     *     *     *

> (6) <u>Long Established Customer Base</u>.  Lorvic has been supplying products to the professional dentistry market for over thirty years, and the Company's top ten customers have been ordering from Lorvic for an average of seventeen years.  Management feels the loyalty of its customer base is Lorvic's most significant competitive advantage in a market dominated by large corporate organizations.

However, Leck was concerned about what he perceived as potential weaknesses in Old Lorvic's substantial profit margins. In order to protect the new company, Leck insisted on a covenant not to compete "that had enough teeth in it," and, which would preclude competition from Scherer. Also, Leck believed that there was a distinct possibility that Scherer could disclose sensitive information that it possessed regarding Old Lorvic's business operations. Accordingly, Leck required a secrecy agreement. Leck would not have purchased the assets of Old Lorvic without these agreements.

After consultations with Shearson Lehman, Scherer established a price of approximately $10 million to $12 million. Several potential buyers considered purchasing the business. In the process of negotiations, Leck reduced his initial offer by $1 million because of concerns that potential competitors would obtain critical information that was being disseminated by Shearson Lehman. Eventually, the only firm offer was that submitted by petitioner's subsidiary, LC Acquisition, for $6.14 million for the assets of Old Lorvic (inclusive of corporate cash), and $1 million for a secrecy agreement and $2 million for a noncompete agreement.

On December 28, 1989, LC Acquisition reached an agreement to acquire the assets of Old Lorvic.[3]  The funds utilized for the acquisition of Old Lorvic originated from petitioner's capital contributions and third parties related to Chemical Ventures. The acquisition documents in the foregoing transaction reflect a purchase price of $5.14 million for the tangible assets.[4]  The foregoing transaction was embodied in an Asset Purchase Agreement (Purchase Agreement).  Concomitantly, petitioner entered into a 5-year noncompete agreement with Old Lorvic, Scherer, and its affiliates, respectively.  In that regard, pursuant to the agreements, petitioner paid $2 million for the noncompete covenant, and $1 million for the secrecy agreement.  The covenant not to compete stated:

    2. <u>Noncompetition</u>.

      (a) For a period of five (5) years after the Closing Date, Scherer and each of the Sellers shall not, and shall cause any Affiliate which it Controls, directly or indirectly, to not, directly or indirectly, enter into, engage in, assist, give or lend funds to or otherwise finance, be employed by or consult with, or have a financial or other interest in, any business which competes with the Business (or any part thereof)

---

[3]Specifically, the Purchase Agreement denominated "LC ACQUISITION CORPORATION," as the "Purchaser," and Scherer and its affiliates as the "Sellers".  See <u>infra</u> p. 13.

[4]Subsequent to the 1989 transaction, Scherer retained and continued to operate SAI, a business previously owned by Old Lorvic.

of the Purchaser within the United States or Canada (the "Territory"), whether for or by itself or as an independent contractor, agent, stockholder, partner or joint venturer for any other Person.

The covenant not to compete also delineated that in the event that any of the sellers (i.e., Scherer and ancillary affiliates) possessed a financial or any other interest, in an entity in the same line of business, the foregoing parties would divest all of their interest within 60 days. Furthermore, in the event of a breach, either actual or anticipatory, LC Acquisitions was entitled to, among other things, temporary or permanent injunctive relief.

In turn, the secrecy agreement described the terms of confidentiality between the seller and the purchaser.[5] The aforementioned agreement provided that for a period of 5 years after the transaction Scherer and its affiliates would not disclose any nonpublic, confidential, or proprietary information such as "analyses compilation, data, studies, or other documents" or use such information in any manner without petitioner's permission. Additionally, one of the terms of the Purchase Agreement provided that Scherer and its affiliates were required to submit "confidential offering memoranda and other sales

---

[5]Both the secrecy agreement and the covenant not to compete utilize and apply essentially the same terms except paragraphs 2 through 6 which refer separately to the terms of the respective agreements.

literature" to petitioner. Finally, the parties agreed to the immediate transfer by wire of $2 million and $1 million for the covenant not to compete and the secrecy agreement, respectively, to Scherer at the closing date.

Richard Nemanick simultaneously entered into an exclusive employment agreement, with LC Acquisition, for a period of 5 years. He also agreed, during his employment, and for a period of 3 years thereafter, not to engage in competition with LC Acquisition or its affiliates.

After the 1989 transaction, LC Acquisition changed its name to the Lorvic Corp. (i.e., New Lorvic), the affiliate of Lorvic Holdings, Inc., petitioner. The written documentation, however, that Richard Nemanick frequently submitted to Scherer prior to the 1989 transaction was not returned to petitioner or its affiliates pursuant to the Purchase Agreement.

Subsequently, petitioner retained the accounting firm, Ernst & Young, to complete a valuation of the assets, tangible and intangible, acquired from Old Lorvic, as well as the noncompete and secrecy agreements, respectively. This evaluation was undertaken to meet the purchase price allocation rules delineated in section 1060.

With respect to the agreements, petitioner claimed the following amortization expense deductions:

| Taxable Year | Noncompete Agreement | Secrecy Agreement | Total Deductions |
|---|---|---|---|
| 1990 | $100,000 | $50,000 | $150,000 |
| 1991 | 400,000 | 200,000 | 600,000 |
| 1992 | 400,000 | 200,000 | 600,000 |
| 1993 | 400,000 | 200,000 | 600,000 |
| 1994 | 400,000 | 200,000 | 600,000 |
| 1995 | 300,000 | 150,000 | 450,000 |
| TOTAL | 2,000,000 | 1,000,000 | 3,000,000 |

On June 29, 1990, Scherer filed a Form 10-K, pursuant to section 13 or 15(d) of the Securities Exchange Act of 1934, with the Securities and Exchange Commission (SEC), for the 1990 taxable year. 15 U.S.C. secs. 78m(a), 78o(d) (1994). The Form 10-K specified that, by 1990, Scherer had disposed of all of its diversified health care products and services businesses, except one specific company, Paco Pharmaceutical Services, Inc. Also, in an undated memorandum entitled "Corporate Development: Status and Strategy", Scherer delineated its general marketing strategies.[6] Among other things, the aforementioned memorandum discussed Scherer's goal, in 1990 and beyond, to acquire companies that contributed a certain amount of money, and possessed "high growth potential in major market areas". The memorandum describes Old Lorvic's acquisition process as part of its "opportunistic diversification" strategy.

---

[6]The record indicates that Richard Nemanick obtained the memorandum in 1987.

In 1995, petitioner's assets and liabilities were sold to Young Innovations (Young), an international supplier of dental products, for approximately $15.2 million.  The acquired assets included cash in petitioner's possession of $1.7 million and corresponding liabilities were $2.4 million.  Simultaneously, Richard Nemanick entered into an employment and noncompetition agreement with Young.  In the process, he also entered into a consulting agreement which included a nondisclosure provision.  However, Leck did not execute a noncompete agreement in favor of Young.

                           OPINION

In this instance, the dispute here centers on how much, if any, petitioner may amortize for the covenant not to compete and the related secrecy agreement.  Stated in a different manner, the issue for our decision is whether any portion of the $2 million and $1 million paid to Scherer pursuant to the 1989 transaction is properly allocable to the covenant not to compete and the secrecy agreement, respectively.  Respondent asserts that the payments pursuant to the agreements were, in substance, payments for the sale of nonamortizable goodwill or going-concern value. Petitioner argues that such deductions are allowable.  In this regard, petitioner bears the burden of proof.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Section 167(a), in general, allows a taxpayer to amortize intangible assets over their useful lives.[7] <u>Citizens & S. Corp. v. Commissioner</u>, 91 T.C. 463, 470 (1988), affd. per curiam 919 F.2d 1492 (11th Cir. 1990); sec. 1.167(a)-3, Income Tax Regs. The standard for deciding whether an intangible is depreciable is that such an asset must have an ascertainable value and a limited useful life, the duration of which can be determined with reasonable accuracy. <u>Newark Morning Ledger Co. v. United States</u>, 507 U.S. 546, 556 n.9 (1993). A covenant not to compete constitutes an intangible asset that has a limited useful life and, therefore, may be amortized over its useful life. <u>Warsaw Photographic Associates, Inc. v. Commissioner</u>, 84 T.C. 21, 48 (1985); <u>O'Dell & Co. v. Commissioner</u>, 61 T.C. 461, 467 (1974).

Conversely, goodwill is the aggregate value of the relationships and reputation developed by a business with its present and potential customers and associates over a period of time. It has been described as the "'expectancy of continued

---

[7]Sec. 167(a), in particular,

> SEC. 167(a). General Rule.--There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)--
> > (1) of property used in the trade or business, or
> > (2) of property held for the production of income.

patronage'". Newark Morning Ledger Co. v. United States, supra at 555-556 (citing Boe v. Commissioner, 307 F.2d 339, 343 (9th Cir. 1962), affg. 35 T.C. 720 (1961)); Metallics Recycling Co. v. Commissioner, 79 T.C. 730, 742 (1982), affd. 732 F.2d 523 (6th Cir. 1984). However, because goodwill is considered not to have a limited useful life, no amortization deductions are allowable. Sec. 1.167(a)-3, Income Tax Regs.[8]; see also discussion in Newark Morning Ledger Co. v. United States, supra at 565-566. Going-concern value is similar to goodwill in that it reflects "the additional element of value which attaches to property by reason of its existence as an integral part of a going concern." VGS Corp. v. Commissioner, 68 T.C. 563, 591 (1977). Consequently, we must decide whether any of the amount paid for the covenant not to compete and the secrecy agreement was a disguised payment for nonamortizable items such as goodwill.

---

[8]Sec. 197, which provides for the amortization of certain acquired assets, such as purchased goodwill, was added to the Internal Revenue Code by the Omnibus Budget Reconciliation Act of 1993 (OBRA-93), Pub.L. 103-66, sec. 13261(a), (g), 107 Stat. 532, 540, and applies to property acquired after Aug. 10, 1993 (the date of enactment). Prior to the 1993 Act, acquired goodwill and going concern value were not amortizable, but other acquired intangible assets were amortizable if they could be separately identified and their useful lives determined with reasonable accuracy. At present, sec. 197 allows taxpayers to amortize certain acquired intangible assets over 15 years, subject to certain exceptions. However, sec. 197 does not apply to the assets in the instant case because they were acquired prior to the date of enactment.

In deciding the issues presented here, we are guided by the following principles.  Simply because a particular taxpayer pays or allocates a specific amount to a covenant not to compete is not controlling for Federal income tax purposes.  Lemery v. Commissioner, 52 T.C. 367, 375 (1969), affd. per curiam 451 F.2d 173 (9th Cir. 1971).  We strictly scrutinize an allocation if it does not have adverse tax consequences for the parties; adverse tax interests deter allocations which lack economic reality. Wilkof v. Commissioner, 636 F.2d 1139 (6th Cir. 1981), affg. per curiam T.C. Memo. 1978-496; O'Dell & Co. v. Commissioner, supra at 468; Haber v. Commissioner, 52 T.C. 255, 266 (1969), affd. per curiam 422 F.2d 198 (5th Cir. 1970); Roschuni v. Commissioner, 29 T.C. 1193, 1202 (1958), affd. per curiam 271 F.2d 267 (5th Cir. 1959); Estate of McDonald v. Commissioner, 28 B.T.A. 64, 66 (1933).  Further, we may go beyond the formalities delineated by the parties to ascertain if the form reflects the substance of those dealings.  Yandell v. United States, 315 F.2d 141, 142 (9th Cir. 1963); Annabelle Candy Co. v. Commissioner, 314 F.2d 1, 5 (9th Cir. 1962), affg. per curiam T.C. Memo. 1961-170.

In order for the form in which the parties have cast their transaction to be respected for Federal income tax purposes, the covenant not to compete and the secrecy agreement must have some independent basis or an arguable correlation to business reality

such that reasonable people might bargain or contract for such an agreement. Schulz v. Commissioner, 294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960). This particular test is referred to as the "economic reality" test. Patterson v. Commissioner, 810 F.2d 562, 571 (6th Cir. 1987), affg. T.C. Memo. 1985-53. An allocation to a covenant not to compete lacks economic reality in the event that there is no showing that the seller by refraining from competition stands to lose earnings comparable to the amount supposedly paid for the covenant or that the buyer would lose such an amount if the seller were to compete against it. Forward Communications Corp. v. United States, 221 Ct. Cl. 582, 608 F.2d 485, 493-494 (1979).

The courts apply numerous factors in evaluating a covenant not to compete. These include: (a) The seller's (i.e., covenantor's) ability to compete; (b) the seller's intent to compete; (c) the seller's economic resources; (d) the potential damage to the buyer posed by the seller's competition; (e) the seller's business expertise in the industry; (f) the seller's contacts and relationships with customers, suppliers, and others in the business; (g) the buyer's interest in eliminating competition; (h) the duration and geographic scope of the covenant, and (i) the seller's intention to remain in the same geographic area. Kalamazoo Oil Co. v. Commissioner, 683 F.2d 618

(6th Cir. 1982), affg. T.C. Memo. 1981-344; Forward
Communications Corp. v. United States, 221 Ct. Cl. 582, 608 F.2d
485, 492 (1979); Sonnleitner v. Commissioner, 598 F.2d 464, 468
(5th Cir. 1979), affg. T.C. Memo. 1976-249; Fulton Container Co.
v. United States, 355 F.2d 319, 325 (9th Cir. 1966); Annabelle
Candy Co. v. Commissioner, supra at 7-8; Schulz v. Commissioner,
supra at 55; Peterson Mach. Tool, Inc. v. Commissioner, 79 T.C.
72, 85 (1982), affd. per curiam 54 AFTR 2d 84-5407, 84-2 USTC
par. 9885 (10th Cir. 1984); Major v. Commissioner, 76 T.C. 239,
251 (1981); O'Dell & Co. v. Commissioner, supra at 468-469; Rudie
v. Commissioner, 49 T.C. 131, 139 (1967); Levinson v.
Commissioner, 45 T.C. 380, 389 (1966).

Finally, fair market value is a question of fact, and the
trier of fact must weigh all relevant evidence of value and draw
appropriate inferences. Commissioner v. Scottish Am. Inv. Co.,
323 U.S. 119, 123-125 (1944); Helvering v. National Grocery Co.,
304 U.S. 282, 294 (1938); Symington v. Commissioner, 87 T.C. 892,
896 (1986); Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd.
731 F.2d 1417 (9th Cir. 1984). With respect to the concept of
fair market value, that term is generally defined as the price
which a willing buyer would pay a willing seller, both having
reasonable knowledge of the facts and neither acting under any
compulsion. See United States v. Cartwright, 411 U.S. 546, 551

(1973). The standard to be applied here is objective, utilizing a hypothetical willing buyer and seller. The foregoing analysis is not, however, a specific standard that focuses on any particular buyer or seller. See Propstra v. United States, 680 F.2d 1248, 1251-1252 (9th Cir. 1982). In addition, the determination of the fair market value of property is a matter of sound judgment, rather than of mathematics. See In re Estate of Williams, 256 F.2d 217, 220 (9th Cir. 1958), affg. T.C. Memo. 1956-239. Moreover, since valuation is necessarily an approximation, it is not required that the value we determine be one as to which there is specific evidence, provided it is within the range of figures that properly can be deduced from the record. Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Hamm v. Commissioner, 325 F.2d 934, 939-940 (8th Cir. 1963), affg. T.C. Memo. 1961-347. Fair market value is determined on the applicable valuation date, which, in this case, is the date that Old Lorvic's assets were acquired by petitioner, and the agreements were implemented. Pabst Brewing Co. v. Commissioner, T.C. Memo. 1996-506.

Respondent suggests petitioner possesses an incentive to allocate a large amount to the covenant not to compete because petitioner could amortize that amount over the life of the covenant. In that vein, respondent asserts that the payments

were either goodwill or going-concern value.  In the alternative,
respondent contends that the covenant not to compete does not
have a limited useful life.  Conversely, petitioner argues that
the aggregate payment of $3 million to Scherer was determined by
a willing buyer and a willing seller, and substantiated by its
experts.[9]

In the instant case, the parties have relied on the opinions
of experts to support their respective views on the fair market
value of the agreements.  We evaluate the expert opinion evidence
in light of the qualifications of the expert and with proper
regard for all other evidence in the record.  Estate of Christ v.
Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C.
493 (1970); IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508
(1991); Parker v. Commissioner, 86 T.C. 547, 561 (1986).  We may
accept or reject an expert's opinion in toto, or we may pick and
choose the portions of the opinion which we choose to adopt.
Helvering v. National Grocery Co., supra at 294-295; Estate of
Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg.
T.C. Memo. 1954-139; Seagate Tech., Inc. & Consol. Subs. v.
Commissioner, 102 T.C. 149, 186 (1994); Chiu v. Commissioner, 84
T.C. 722, 734 (1985).

---

[9]Hereafter, the covenant not to compete and the secrecy
agreements will, collectively, be referred to as, "the
agreements".

We turn to the qualifications and testimony of the three witnesses whom the Court recognized as experts for purposes of this proceeding.  First, petitioner presented David P. Schutte, Ph.D. (Dr. Schutte), a senior associate for Business Valuation Services (BVS).  Dr. Schutte possesses a Ph.D. in economics from the University of Minnesota, an M.S. in applied math from the University of Texas, and a B.A. in economics from the University of California at Berkeley.  Prior to his tenure with BVS, Dr. Schutte taught finance at the University of North Texas.  He has also published articles on economics and finance and authored a standard reference on business valuation.

Dr. Schutte reviewed the publicly available information, such as Scherer's annual report, as well as internal, confidential documents with respect to Scherer provided by Nemanick.  He also conducted discussions with Nemanick and Leck. In calculating the value of the agreements, Dr. Schutte applied the discounted present value of cash-flow to determine the value of petitioner with and without the foregoing agreements.  The starting point of his calculation was his determination that the value of the business with the agreements was $8,255,049.  In his report, Dr. Schutte pointed out that his conclusion was consistent with the parties' valuation of Old Lorvic and the agreements.  Next, Dr. Schutte calculated the value of the

agreements by determining petitioner's value without the agreements and subtracted that value from the previously determined value of the business with the agreements. The difference in value of the business was held to be directly attributable to the agreements.

Dr. Schutte valued petitioner's business without the agreements to be $4,924,636. In that vein, he calculated that, in the aggregate, prior to the consideration of the actual transaction value, the agreements were worth $3,330,413. Then, he divided $3,330,413 by $8,255,049 to reach a figure of 0.4034. In other words, Dr. Schutte believed that the value of the agreements was equivalent to 40.34 percent of the purchase price of $8.14 million.

Second, petitioner presented Thomas P. Lee (Lee) an appraiser of business and intangible assets for Arthur Andersen, L.L.P. Lee possesses an M.B.A. from New York University. He also has an M.S. as well as a B.S. in civil engineering from the Polytechnic Institute of New York. Lee is a member of, and has attended conferences and seminars with, the American Society of Appraisers. Prior to his tenure with Arthur Andersen, L.L.P., Lee was employed by several accounting and valuation firms including, among others, Ernst & Young, L.L.P. Subsequent to the 1989 transaction, while employed with Ernst & Young, L.L.P., Lee

prepared a confirming appraisal for petitioner. The report was intended to determine the value of the assets for purposes of a section 1060 allocation.

In his analysis, Lee applied the discounted cash-flow method over the 5-year period covered by the agreements. He calculated the cash-flow over the 5 years covered by the agreements under two scenarios: (1) Petitioner was protected by the agreements; and (2) where petitioner was harmed by the competition and disclosure of information by Scherer. Then, he determined the differences in the cash-flow which would be forgone in the absence of the agreements. Lee stated that the discounted present value of the differential between the cash-flows in the foregoing scenarios was the fair market value of the agreements. In this appraisal, Lee assigned a value of $2 million for the covenant not to compete, and $1 million for the secrecy agreement.

Finally, the Court recognized as an expert, Joseph H. Wildt (Wildt), an engineer with respondent. He possesses an M.S. in valuation, and a B.S. in electrical engineering. He acquired the master's degree in 1981. Also, Wildt has attended numerous courses presented by the American Society of Appraisers regarding business valuation. Finally, Wildt had been a senior member of

the American Society of Appraisers for approximately 15 years but is now a member of the Institute of Business Appraisers.

Wildt's ultimate analysis and conclusion was that the agreements possessed a value of $1.209 million. In his report, Wildt estimated petitioner's cash-flow for the 5-year lives of the agreements with the assumption that the agreements were in force and that Scherer did not contest in the same market. Then, he estimated the cash-flow over the same time period based on the assumption that Scherer was in direct competition with petitioner, and the likelihood of that particular factor.

In his report, Wildt determined that the effect of competition by Scherer would decrease over the life of the covenant. Wildt analyzed 15 factors to determine the extent and magnitude of competition from Scherer. Finally, Wildt determined that petitioner would enjoy tax benefits from the amortization deductions available for the agreements.

Here, we do not agree with either party in all respects. In that regard, we find that the experts provided some useful, although limited, help in our examination and appraisal. Nevertheless, we are not significantly persuaded by any one of the experts. The parties' experts, in general, utilized the discounted cash-flow method in valuing the covenant not to compete and the secrecy agreement. In other words, the experts

compared petitioner's projected net income with and without the agreements.  We think, however, that petitioner's expert witnesses, Dr. Schutte and Lee, overestimated the value of the covenant not to compete and the secrecy agreement.  Both experts relied too heavily on unwarranted assumptions.  Both Lee and Dr. Schutte did not identify with particularity the factor(s) that would have impelled Scherer to compete.  The only material factors that Dr. Schutte and Lee could point to were threefold: (1) Scherer possibly retained an institutional record of sensitive information regarding Old Lorvic's products, suppliers, distributors, and marketing data; (2) Scherer was familiar with the products that were relatively simple to manufacture, and rendered significant returns on Old Lorvic's initial investment; and (3) Scherer had the capability of competing with Old Lorvic, and might, at any given point in time, reassess its initial decision to leave the specialized dental care market.[10]

---

[10]Also, in the instant case, petitioner relies heavily on Thompson v. Commissioner, T.C. Memo. 1997-287.  We, however, find the citation to Thompson, to be inapposite.  In the foregoing case, the taxpayers were individuals who had extensive knowledge and experience of the beauty supply business, as well as substantial relationships with suppliers and distributors. Accordingly, the record there "overwhelmingly [established] a strong need, and a corresponding high relative value," for the noncompete agreements.  Thompson.  Here, petitioner, a corporation, has not demonstrated that there was an overwhelming need for the noncompete agreements.  Further, in Thompson, there was an ample record of negotiations between the parties regarding
(continued...)

We found Lee's appraisal report, published under Ernst & Young's aegis, to be useful and informative in summarizing some of the facts and issues which are in dispute here. However, his report suffers from unexplained assumptions. For example, in his report, he concluded that Scherer would not find it difficult to compete with petitioner. At trial, Lee conceded that Scherer did not have a relationship with either the suppliers or distributors of Old Lorvic's products. The record manifests that Scherer had a detached relationship with its affiliate, Old Lorvic, other than the periodic reports that Nemanick submitted to the parent company. Hence, Scherer did not develop business or personal relationships with the suppliers or distributors. Moreover, Lee evidently disregarded the fact that, in essence, Old Lorvic was managed by the Nemanick family and assumed that Scherer could have induced petitioner's employees through increased financial compensation to work for Scherer. In that connection, we observe that Scherer did not retain any of Old Lorvic's employees subsequent to the 1989 purchase.

Also, in his report, Lee stated that the fair market value of certain real property was consistent with an appraisal made in

[10](...continued)
the noncompete and employment agreements. In contrast, petitioner here relies heavily on experts and sparse documentation.

1985.  In our opinion, we think that there would have been some significant increases or, at least, variations in the value of the real property in the space of 4 years.  Finally, we note that Lee, in his determination of the value of the secrecy agreement, did not explicitly state the grounds for valuing the aforementioned agreement at $1 million.  He appears to have based that valuation on the fact that the purchasers reduced Old Lorvic's purchase price by that particular amount upon learning that Shearson Lehman was circulating the Descriptive Memorandum.

Next, we are not satisfied with the testimony of Dr. Schutte.  At the outset, Dr. Schutte submitted a report which was later revised to correct numerous and substantive mathematical errors.  We are not certain they were adequately corrected.  We, therefore, do not have great confidence in the substance of Dr. Schutte's report and testimony.  In that setting, we scrutinize Dr. Schutte's report.

Dr. Schutte conducted discussions with Nemanick and Leck regarding Old Lorvic's business and reviewed the relevant financial information appurtenant to the 1989 purchase.  Dr. Schutte's estimations, however, present us with some difficulty.  Dr. Schutte computed that, in any given year, there was a 30-percent probability that Scherer would enter the market in competition with petitioner.  In that vein, Dr. Schutte estimated

that once Scherer was in the same business, it would become an effective competitor over time. He did not adequately explain the premises behind the foregoing figure. Moreover, Dr. Schutte stated that the most likely scenario involving possible competition by Scherer was for the company to introduce one or more competing products in select niche markets. However, Dr. Schutte appears to have calculated the possibility of competition in all of the products. This, of course, results in an overall reduction in projected revenues. We do not think that Dr. Schutte's assumptions, in this regard, result in a consistent and accurate computation.

On the other hand, respondent's expert, Wildt, provided significant detail and insight in his analysis of the 1989 transaction although there were some problems with his testimony and report. For example, he was, in some respects, unfamiliar with New Lorvic's business or the nature of its operations. He did not interview any of the principals or visit New Lorvic's management and operation facilities in an effort to ascertain the background and circumstances behind Scherer's sale of Old Lorvic's assets. Moreover, Wildt compared the company with unnamed publicly traded companies in the dental supply market. However, his report does not indicate the comparable companies, the date, or sources of information.

We think that Wildt neglected the importance of the likelihood that Scherer possessed sensitive information concerning Old Lorvic's business operations such as the profitability of Lorvic's product lines, and the identities of the suppliers and distributors. Richard Nemanick's testimony at trial established that the monthly reports on Old Lorvic's operations, which included its top 10 products and its major customers, were prepared and circulated to Scherer. Also, the testimony reflects that Richard Nemanick frequently discussed the contents of these reports with the Scherer managers.

Therefore, we do not find the contributions of any of the experts to be, ultimately, dispositive of the issue before us. We, consequently, address the issue on the basis of the record before us.

At the date of the 1989 transaction, Scherer was actively engaged in the international research, development, manufacture, and distribution of drug delivery systems which, in turn, were marketed through distributor networks. Scherer possessed affiliates which were involved in businesses in the health care field. It was a large, well-capitalized, multinational corporation, with production facilities, distribution networks, and an extensive brand name recognition among health care professionals. Accordingly, Scherer with its marketing expertise

and manufacturing facilities would not have had to incur tremendous startup costs or, even, allot significant economic resources in order to compete effectively with petitioner.

New Lorvic, however, did not have long-term contracts with either the business suppliers or distributors subsequent to the 1989 transaction. In that vein, we note that the customer base was not bound, contractually or otherwise, to Old Lorvic's products. Consequently, the distributors and ultimate customers were not precluded from testing the effectiveness of other products. On the other hand, in Richard Nemanick's estimation, Old Lorvic did not have a single competitor that designed, manufactured or distributed a wide range of similar or identical items.

The parties evidently agree that most of petitioner's products were relatively simple to manufacture. Hence, a potential competitor would find it elementary to replicate the majority, if not all, of the products. Thus, competition from Scherer or any disclosure to outside individuals or entities of the proprietary information from petitioner would have had significant impact on petitioner's bottom line. For example, Old Lorvic's top 10 customers constituted more than 50 percent of its revenues. Therefore, we believe that any competition by Scherer would substantially harm petitioner's profit margins.

During Scherer's ownership of Old Lorvic, Richard Nemanick submitted monthly and annual reports on the top 10 suppliers and customers. It is petitioner which concedes that the contractual requirement that all documentation retained by Scherer was to be returned was not, in fact, satisfied. In that regard, we observe that Leck, at trial, considered any written information that Scherer retained after the sale, to be "a minor detail." He considered it the responsibility of his partner, Richard Nemanick. Similarly, Richard Nemanick did not consider the information to be important. Furthermore, Richard Nemanick considered the covenant not to compete as "window dressing". We infer, therefore, that the parties were not overly concerned with the possibility that Scherer would compete with petitioner.

The parties were sophisticated and engaged in customary and conventional negotiations regarding the purchase of Old Lorvic's assets, culminating in the appurtenant agreements. In that regard, the record does not indicate that the parties possessed adverse financial interests in regard to the allocation of $3 million to the agreements. Furthermore, the agreements incorporated clauses which provided that petitioner could enforce the covenant and the appurtenant secrecy agreement in the event that Scherer did not abide by these terms. However, we observe that the subsequent Ernst & Young report did not make an

allocation between goodwill or going-concern-value and the agreements as a whole. Moreover, the record manifests that the parties were somewhat cavalier regarding the valuations for goodwill in 1985 and 1989.

The secrecy agreement and the covenant not to compete are comparable, in nature, to the 1985 agreements. The record reflects that the parties in the 1985 transaction implemented an agreement not to compete in Article XIV. Specifically, Old Lorvic's "principal stockholders" were precluded from entering into or financing the entry of others into the business of Old Lorvic, or any business or branch of business similar to that of Old Lorvic. In addition, Richard Nemanick was contractually bound in his capacity as an executive officer of Old Lorvic by an exclusive employment agreement. The record indicates that an exclusive employment agreement ensued from the 1989 purchase of Old Lorvic's assets.

Finally, Scherer's Form 10-K, filed on June 29, 1990, with the SEC provided that the company intended to concentrate on its primary business of softgel capsule production and divest itself of subsidiary businesses affiliated with health care products and services. We believe that the aforementioned document simply evidences Scherer's divestiture plans after it had entered into the agreements with petitioner. At the time Scherer filed the

Form 10-K with the SEC, the agreements prohibited Scherer from competing in the professional dental products market. Consequently, this document possesses little probative evidence of what Scherer's intentions and designs for the future would have been in the absence of the agreements.  Furthermore, Scherer's undated, internal memorandum does not evidence that, because of "opportunistic diversification", it would, eventually, compete with petitioner.[11]  If anything, we think it unlikely that Scherer would sell the assets of Old Lorvic because it did not fit its then current marketing strategy, and subsequently, enter into competition with an entity endowed with significant advantages such as petitioner.

In sum, we believe that Scherer had the economic and industrial potential to compete, the items or products manufactured by petitioner could be manufactured with significant profit margins, and Scherer might, at any point in time, decide to compete.  The record, however, does not manifest that Scherer had the intent to compete with petitioner.  Scherer possessed a significant disadvantage in that it did not have relationships with either the suppliers or distributors.  In particular,

---

[11]Petitioner and its expert witnesses suggest Scherer possessed an economic history of periodically changing its marketing orientation and strategies.  However, petitioner has not submitted sufficient evidence to prove or disprove this particular thesis.

Richard Nemanick possessed extensive relationships with suppliers and distributors, and that factor was a significant inducement to the purchase of Old Lorvic's assets and to the retention of Nemanick's services, as evidenced in the Distribution and Acquisition Memoranda compiled by Shearson Lehman and Leck, respectively.

In view of what we consider deficiencies and conflicts in the reports and testimony of the experts for both parties, and what we consider to be either oversights or deficiencies in the documentation of the foregoing transactions, we believe and decide that petitioner has not fulfilled its burden of persuasion. For example, had petitioners provided stronger enforcement provisions for its protection to assure compliance with the agreements, such as injunctive relief or liquidated damages for violations, the petitioner's position would be more credible, especially in light of the substantial dollar amounts appurtenant to the agreements being paid up front. Also, we find it apparent that there was abundant going concern value which was not adequately addressed by petitioner either in the testimony of its management or in its experts' reports. For example, the retention by petitioner of the seller's existing management is an obvious reflection of the going concern value and petitioner's objective to assure its continuance. However, we believe and

determine that the agreements did have value, but not as much as petitioner asserts or as little as respondent contends.  Using our best judgment, we shall discount petitioner's claimed value by a percentage we feel would be appropriate under the circumstances, i.e., 25 percent, to reflect an appropriate and approximate cost of enforcement for any ensuing violations and to recognize the inherent going-concern value.  Consequently, in light of all the facts and circumstances, we determine and hold that the fair market values of the covenant not to compete and the secrecy agreement are $1.5 million and $750,000, respectively.

<u>Decisions will be entered under Rule 155</u>.