**ANNABELLE CANDY CO.,** Petitioner,

v.

**COMMISSIONER OF INTERNAL REV-
ENUE,** Respondent.

**No. 17576.**

United States Court of Appeals
Ninth Circuit.

Aug. 22, 1962.

Rehearing Denied Dec. 11, 1962.

Dinkelspiel & Dinkelspiel, John F. Taylor, San Francisco, Cal., for petitioner.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Charles B. E. Freeman, Attys., Dept. of Justice, Tax Division, Washington, D. C., Crane C. Hauser, Chicago, Ill., Chief Counsel, Bruce Terris, Washington, D. C., Attys., Internal Revenue Service, for respondent.

Before BARNES, HAMLEY and JERTBERG, Circuit Judges.

BARNES, Circuit Judge.

This is another tax case involving solely the allocation of the purchase price of certain corporation stock between asset value, good will, if any, and a covenant not to compete.

It involves the assessment of a deficiency in federal income tax for the years 1956 and 1957. The Commissioner mailed the notice of deficiency for the calendar years 1956 and 1957 in the amounts of $5,236.06 and $3,035.12, respectively, on July 14, 1959. Within ninety days, and on October 5, 1959, a petition for redetermination was filed with the Tax Court under the provisions of Section 6213 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 6213. On June 12, 1961, the Tax Court entered its decision[1] affirming the deficiencies assessed by the Commissioner. A timely petition for review was filed; this court has jurisdiction under Section 7482 of the Internal Revenue Code of 1954.

Though other issues were before the Tax Court, the only question here presented is whether the Tax Court correctly held that petitioner-appellant[2] was not entitled to deduct from its federal income taxes amounts represented as the amortized cost of a restrictive covenant.

The facts as found by the Tax Court (many of which were stipulated) which are here pertinent may be summarized as follows:

For several years prior to 1955, Sam Altshuler and Fred Sommers engaged in the business, as equal partners, of manufacturing and selling candy. They incorporated taxpayer under the laws of California in November 1954 and began doing business in corporate form on January 1, 1955. Each owned fifty per cent of taxpayer's outstanding common stock. Altshuler became president and Sommers became vice president, and both were directors and actively conducted taxpayer's business.

Virtually the entire volume of taxpayer's sales was dependent on one ten-cent candy bar marketed under the name of "Rocky Road." This name was taken from the type of marshmallow and chocolate candy which was well known in the candy industry and for years had been sold in bulk form in candy stores. The recipe or formula for manufacturing rocky road candy and the name "Rocky Road" are not subject to protection from competitors by registration in any manner, whether by patent, trade-mark, or

---

1. The memorandum findings of fact and opinion of the Tax Court are not officially reported. (R. 22–35.)

2. Hereinafter for convenience referred to as "taxpayer".

trade name. There are, however, different methods of making rocky road candy which are not generally known or applied throughout the candy industry. Taxpayer employed unique production methods in manufacturing its candy bar which were valuable to taxpayer, and it marketed its candy bar in a distinctive red wrapper. Both Altshuler and Sommers had full knowledge of taxpayer's unique production methods.

Differences arose between Altshuler and Sommers and they finally decided, in the latter part of 1955, that they no longer could work together. Court action to dissolve taxpayer was a possibility. However, in December of 1955, attorneys for Altshuler and Sommers began negotiations for a method of eliminating one of the clients from participation in the business, but at the same time preserving the business. The attorneys mutually agreed that it would be best for their principals and for the business if a purchase and sale arrangement could be agreed upon without court action.

Altshuler and Sommers were each interested in buying the other's fifty per cent interest in taxpayer's common stock. During the early months of 1956, lengthy negotiations centered on the question of (1) who would be the buyer, (2) who would be the seller, and (3) the purchase price. These questions were finally resolved by an agreement dated May 15, 1956, between taxpayer and Sommers. The agreement provided for a total consideration of $115,000 to be paid in installments to Sommers by taxpayer. Sommers agreed, *inter alia*, to deliver his fifty percent stock interest, to retire from active participation as an officer and director, and not to compete nor engage in any activities which might be prejudicial to taxpayer's business for a period of five years.[3]

The restrictive covenants were first discussed by the parties and their counsel after the purchase price of $115,000 for the stock interest had been preliminarily agreed upon and when safeguards for the buyer and security for the seller were then considered. The agreement of May 15, 1956 made no allocation of any portion of the total consideration of $115,000 to the restrictive covenants. Prior to May 15, 1956, there were no discussions between Altshuler and Sommers or their respective attorneys concerning the subject of an allocation of the purchase price to be made to the covenants. Taxpayer's dollar allocation to the covenant not to compete was made subsequent to May 15, 1956, without the knowledge or consent of Sommers.

No separate or severable consideration was bargained for, or paid, for the cove-

3. The restrictive covenants to which Sommers agreed were as follows:

"(b) For a period of five (5) years from date hereof not to:

"1) Initiate, organize or be a part of a candy business as an employee, consultant or otherwise, within a radius allowed by law, dating from the execution of an agreement signed by said principals.

"2) Manufacture, sell or in any manner distribute or cause to be manufactured, sold or in any manner distributed, any marshmallow bar, and/or to enjoy any gain therefrom.

"3) Manufacture, sell, or in any manner distribute or cause to be manufactured, sold or in any manner distributed, or to enjoy any gain therefrom, of any candy, particularly a candy bar that would be described, designed or in any manner be projected or known as 'Rocky Road,' or by any one of those two words alone, or in combination with another word or other words.

"4) Reveal, or in any manner disclose to anyone in the candy business, or to any other person, the formula, contents or processes that enter into and are a part of the composition of the candy manufactured in any form or size and sold as 'Rocky Road' by the Annabelle Candy Co., Inc.

"5) Use any red wrapper on any candy bar he may manufacture, sell or in any manner distribute or cause to be manufactured, sold or in any manner distributed, or to enjoy any gain therefrom.

"6) Persuade, encourage or suggest, directly or indirectly to any employee of the Annabelle Candy Co., Inc., during the life of this contract between the principals, that he or she leave the employment of said Annabelle Candy Co. or to reveal any of the operations of the said Annabelle Candy Co." (R. 26–27.)

nant not to compete contained in the agreement of May 15, 1956.

Taxpayer's earned surplus amounted to $40,082.05 on May 15, 1956. By statute in California, a corporation may redeem its stock only out of earned surplus. (Calif.Corp.Code §§ 1705–1708.) Neither taxpayer's representatives nor Sommers and his counsel were aware of the possible applicability of these sections of the law of the State of California when they negotiated and signed their agreement of May 15, 1956.

In its 1956 income tax return, taxpayer allocated $80,554.67 of the $115,000 purchase price to the covenant not to compete and began amortization of the $80,-554.67 over the covenant's five-year term at a rate of $16,110.93 per year, claiming $10,069.93 for the remainder of 1956, and the full $16,110.93 for 1957. The Commissioner disallowed these claimed deductions, determining that the entire $115,000 was paid for Sommers' stock interest, that no portion was allocable to the covenant not to compete, and that, accordingly, taxpayer was not entitled to amortization deductions for the taxable years.[4]

The Tax Court sustained the Commissioner's deficiency determinations on the basis of its finding that no separate or severable consideration was bargained for or paid for the covenant not to compete.

Taxpayer contends there were four errors:

(1) The evidence is clear—and the Tax Court recognized—that the covenants here in question had substantial value; therefore the denial of taxpayer's deductions on the grounds that the parties had not agreed on a separate value for the covenants and that the covenants were "nonseverable" from the transfer of stock is erroneous and contrary to the principles applicable to this case.

(2) It is not a prerequisite to a deduction based upon the amortization of a covenant not to compete that the conditions imposed by the court below be met; if the covenants have value, contends taxpayer, an allocation *must* be made to it, and the purchaser given the benefit of a deduction equal to its value.

(3) Its allocation to the covenant not to compete is realistic and, being required by law, should be upheld; but even if its allocation is too large the correct allocation should be determined by the courts; the deduction cannot be ignored merely because the parties failed to agree to an allocation.

(4) And, lastly, taxpayer contends the test of "severability" here applied by the Tax Court is artificial and unrealistic, and has recently been criticized by this court; and an assignment of value based upon the impact of California law is required, even though the parties did not negotiate the contract with actual knowledge of the possible application of the law.

The Commissioner concedes that the depreciation deduction authorized by § 167(a) (1) of the Internal Revenue Code of 1954 for property used in trade or business applies to a covenant not to compete for a definite term. But, contends the Commissioner, the deduction, amortized over the term of the covenant, is "of the amount paid (or other basis) for the covenant. \* \* \* [And,] if a contract contains such a covenant but nothing has been paid for it, there is nothing to be deducted." It is, therefore, the Commissioner's position that:

"[A] covenant not to compete contained in a contract has no tax effect as to either the vendor or the vendee

---

4. On November 25, 1959, taxpayer filed an action against Sommers in a Superior Court in California based in part on the agreement of May 15, 1956, in which it requested recovery of all money paid under that agreement with interest. In that suit, taxpayer took a position inconsistent with that taken in the present case, alleging that the agreement was for the purchase by it of Sommers' stock for $115,000. But that action was brought against Sommers as a protective suit in case taxpayer's position regarding the covenant not to compete was not sustained by the Tax Court.

unless (1) the parties *treat* the covenant as an item for which a *separate* amount is paid the vendee and (2) such treatment is in fact realistic. The first requirement—in effect, a showing that the parties intended separate payment for the covenant— will generally be satisfied if the contract allocates a part of the consideration to the covenant."[5]

And, according to the Commissioner, "we are [here] primarily concerned with the *first* requirement, i. e., that the parties treat the covenant as an item for which a separate amount is paid by the vendee."

The Commissioner's position, otherwise stated, is

"We do *not* contend that the presence or absence of an express dollar allocation to the covenant not to compete is a *controlling* test *per se*. What we contend is that the *evidence* must show that the parties treated the covenant as a separate item for which consideration was paid. * * *" (Emphasis the Commissioner's.)

The Tax Court's findings indicate that Sommers' covenant not to compete was contained in the contract dated May 15, 1956. But, according to the findings of the Tax Court, the parties had not discussed the covenant until *after* the purchase price had been *preliminarily* agreed upon and when safeguards to the parties were being discussed. The Tax Court therefore held there was no convincing proof the parties treated the covenant "in a separate and distinct manner," relying on United Finance and Thrift Corporation of Tulsa, 31 T.C. 278, 285, affirmed (4 Cir. 1960) 282 F.2d 919, certiorari denied 366 U.S. 902, 81 S.Ct. 1045, 6 L.Ed.2d 202, and,

"Thus, we were unable to find as petitioner contends that it was the intent of the agreement of May 15,

1956 that a portion of the $115,000 which petitioner agreed therein to pay Sommers was in consideration for Sommers' promise not to compete in the candy business. * * *" (R. 32.)

In the United Finance case, supra, cited by the Tax Court, the taxpayers claimed they were entitled to amortize the cost of covenants not to compete over their term; in the United Finance case the contracts, wherein the covenants were given, contained a specific allocation made to the cost of the covenants. Yet, there, the fourth circuit affirmed the Tax Court's decision that part of the cost allocated in the contract to the covenants should be attributed to the purchase of good will; the fourth circuit also affirmed the Tax Court's allocation between the cost attributable to the covenants and to the purchase of good will, which the Tax Court made according to its best judgment under the principles of Cohan v. Commissioner, 2 Cir. 1930, 39 F.2d 540.

Thus, we read the United Finance case as holding that the courts may look behind the contract. The form of the contract itself does not necessarily control. This interpretation of the United Finance case makes it entirely consistent with this court's recent decision in Schulz v. C. I. R., 9 Cir., 1961, 294 F.2d 52. In Schulz, this court said:

"The rules enunciated herein, namely, that in proper cases the commissioner can go beyond the formal dealings of the parties to see if these forms reflect meaningful substance—are elementary in the law of taxation and find support in the Supreme Court. [Citations.]" (294 F.2d at 56.)

Though this court's Schulz case and the fourth circuit's United Finance case both deal with good will, the teachings of both are applicable to the case at bar—

5. (Emphasis the Commissioner's.) Citing Rogers v. United States, 9 Cir., 1961, 290 F.2d 501; Commissioner v. Gazette Tel. Co., 10 Cir., 1954, 209 F.2d 926; and Hamlin's Trust v. Commissioner, 10 Cir., 1954, 209 F.2d 761. The Commissioner cites the Gazette Tel. Co. case, at page 928, for the best statement of the general rules here applicable.

a statement to which the Tax Court has implicitly agreed by its citation of the United Finance case.[6]

In the Schulz case, the Tax Court also found a covenant not to compete nonseverable. There it was nonseverable from good will; here it was found nonseverable from Sommers' stock interest in taxpayer. The Tax Court apparently applied the same test for "severability" in both cases.

In Schulz, this court said:

"The determination of whether or not the covenant is 'severable' or 'nonseverable' has no probative value in determining whether or not it should be considered as a surrender of income—and hence a covenant— or a component of the business which was sold—and hence part of the assets.

"The difficulty may have arisen from confusion with a factual issue which *is* probative of the issue of whether or not there is a genuine covenant. If there is reason to believe that the business has prospered because of the character or the reputation of the proprietor or partner— the friendly bartender or the trusted stockbroker are examples—this would tend to show that a genuine business reason prompted the covenant. Such reputation or character would also form part of the good will. However, the question is one of fact and not one of classification as 'severable' or 'nonseverable'." (294 F.2d at 56.)

In the case at bar (unlike the Schulz case), the Tax Court found that the covenant not to compete played a very real part in the negotiation of a final contract between the parties. The record also shows the uncontradicted testimony of taxpayer's president (Altshuler) that taxpayer "needed [the covenants] very badly." And, though the Commissioner urges facts by which he attempts to show that Sommers' covenant not to compete had little value, the evidence shows the contrary.

The taxpayer was a successful enterprise.[7] As mentioned above, taxpayer employed unique methods in the production of its candy bar. And Sommers was generally in charge of the production of taxpayer's candy bar while he was associated with taxpayer. Furthermore, Altshuler testified that he himself had failed several times in the candy business, including twice in making Rocky Road candy bars.[8] Thus Altshuler's uncontradicted conclusion that he "needed [the covenants] very badly" has substantial basis in the record.

■ The fact that a preliminary purchase price had been agreed upon before the parties began discussing restrictive covenants does not necessarily preclude such covenants from being of value; nor does it preclude the court from allocating a value—a portion of the total contract price—to such covenants when no specific allocation is made by the parties in the contract.[9] We think the reasoning of the court in Wilson Athletic Goods Mfg. Co. v. Commissioner, 7 Cir., 1955,

6. This court's decision in the Schulz case could not, of course, have been considered by the Tax Court in the case at bar as it was not rendered until after the Tax Court had entered its judgment in the case at bar.

7. It had profits of $30,701.22 in 1955, and $21,449.89 for the first five months of 1956 (Exs. 10–J, 12–M) on an invested capital of $29,099.88.

8. It is interesting to note that the Commissioner cites this testimony as evidence of the fact that Sommers' covenant not to compete was of little value. It is also interesting to note that, where it serves his purpose, the Commissioner gives full credence to Altshuler's testimony, but does not give great weight to it when it is not quite so becoming to his contentions.

9. As was so well stated by Judge Learned Hand in Commissioner v. Maresi, 2 Cir. 1946, 156 F.2d 929, at 934:
"The one sure way to do injustice in such cases is to allow nothing whatever upon the excuse that we cannot tell how much to allow."

222 F.2d 355, particularly at 356–357, here controls.

In the Schulz case this court also said:

"Of course, it is clear that we do not agree with the dicta found in Hamlin's Trust case regarding the covenant as severable or nonseverable, 209 F.2d 761 at 765." (294 F.2d at 56.)

The Hamlin Trust case is one of the cases which the Commissioner here cites as announcing the correct "severability" rule. (See note 5, supra.) What we said for the Hamlin Trust case applies with equal force to Commissioner v. Gazette Tel. Co., supra. The latter was decided two days before the former by the same tribunal; it involved the same business transaction as the former, and used substantially the same language with regard to severability.[10]

 In the purchase agreement involved in the case before us, there is no allocation of consideration to the covenant not to compete. While this is pretty good evidence that no such allocation was intended it is not conclusive on the parties as would be the case if there had been an express affirmance or disavowal in the agreement. But the petitioner, which was asking for a redetermination of a tax deficiency, had the burden of proving that, notwithstanding the lack of any recital to that effect in the agreement, the parties intended to allocate consideration to the covenant. The Tax Court held that petitioner failed to sustain that burden of proof.

It is true, as the Tax Court found, that the covenant not to compete played a very real part in the negotiation of a final contract between the parties, and was a valuable benefit to the petitioner. But if the parties did not intend that a part of the purchase price be allocated to this important and valuable covenant, that intention must be respected. Unless respected, the tax consequences which they contemplated as incident to the benefits and burdens of the contract would be disturbed.

There was substantial evidence tending to show that no such allocation was intended. The desirability of a restrictive covenant was not discussed until the purchase price of $115,000 was settled by preliminary agreement. There was never any discussion of an allocation of part of that price as consideration for the covenant.

Before the agreement was executed Sam Altshuler was advised by petitioner's bookkeeper that an allocation should be made in the agreement or it would not be recognized for tax purposes, yet no allocation was therein made. After execution of the agreement petitioner made a unilateral allocation to its advantage and to the disadvantage of Sommers, without the latter's knowledge or consent. These circumstances warrant the inference that Altshuler purposely refrained from bringing up during the negotiations this matter concerning which he was fully informed because he was afraid Sommers would not agree.

We think that in this approach to the basic legal problem of the case the Commissioner admittedly was concerned "primarily" with whether there existed a separate sum to be paid for the covenant, and whether the covenant was "severable." Agreeing that a mere dollar designation is not controlling *per se*, we find the Commissioner applying again the

---

10. Its holding is applicable to those cases factually similar, as we said in Rogers v. United States, supra, note 5, where we held that the trial court could refuse to go behind the terms of the agreement when urged to determine what portion of the consideration was paid for the covenant not to compete. Here, as in Wilson, supra, the evidence discloses "realistic" evidence of "good faith" designation. In Schulz, on the other hand, four of the

five factors mentioned primarily indicated a sale of good will, rather than payment for a covenant not to compete. No one of these four exists in this case, i. e., (a) the lack of desire of the seller to compete, (b) the inability of the seller to compete, (c) the short covenant existing only during a war emergency, (d) the minimal nature of the restrictive covenant, both as to time and area.

weight of the evidence rule to determine if the parties agreed to the severability of the sum paid for the covenant not to compete, rather than the *intent* of the parties that *some* part of the contract, severable or unseverable, was paid for the covenant.

Did the parties, not preliminarily, but when they signed this agreement, *intend* to allocate a portion of the purchase price to the covenant not to compete? If so, Altshuler should be allowed to obtain the tax benefits flowing therefrom. If not, Sommers should be allowed to obtain such tax benefits.

But that determination must be made from a consideration of conflicting facts, uninfluenced by the Tax Court's belief that "primarily" the question is whether or not the contract was "severable"; or whether the covenant was "treated in a separate and distinct manner."

We are left with the firm conviction that the Tax Court erred in placing too much emphasis on an erroneous theory of law. A mistake has been made, not in judging facts, but in applying law. United States v. United States Gypsum Co., 1948, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746. The parties are entitled to a clear cut decision as to what their intent was, as evidenced by the agreement and all the surrounding circumstances.

We remand the matter to the Tax Court for a rehearing, with the opportunity for either party to offer evidence on the limited issue outlined above.

In such proceedings, the burden of proof is on the taxpayer.

On Petition for Rehearing.

PER CURIAM.

The petition for rehearing and reply thereto establish more clearly than was heretofore apparent, that at the time the contract for the purchase of Sommers' stock was executed there was no expressed intention one way or the other as to allocation and tax consequences. It follows that the petitioner failed to sustain its burden of proving that, not-withstanding the lack of any recital to that effect in the agreement, the parties intended to allocate consideration to the covenant.

Accordingly we are now of the view that there is no need of remanding the matter to the tax court for a rehearing on the question of intention. The opinion is therefore modified to provide, in lieu of a remand, that the decision of the tax court be affirmed. In other respects the opinion stands, as a means of indicating our disagreement with certain views expressed in the decision of the tax court and the erroneous legal theory upon which it relied, which views and theory, however, under the circumstances did not affect the correct disposition of the case.

The petition for rehearing is denied.