T.C. Memo. 2006-264

UNITED STATES TAX COURT

R. WILLIAM BECKER AND MARY ANN BECKER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

BECKER HOLDING CORPORATION AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 13725-02, 6400-03.    Filed December 13, 2006.

<u>Scott M. Dayan</u>, <u>Stanley H. Eleff</u>, <u>William P. Ewing</u>, <u>Michael K. Green</u>, and <u>Ellen Wasserstrom</u>, for petitioners in docket No. 13725-02.

<u>Jerald David August</u> and <u>James P. Dawson</u>, for petitioner in docket No. 6400-03.

<u>Andrew M. Tiktin</u> and <u>Sergio Garcia-Pages</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, Judge:  Respondent determined a deficiency in petitioners R. William Becker and Mary Ann Becker's Federal income tax of $615,681 for their 1996 taxable year.[1]  Respondent determined the following deficiencies in petitioner Becker Holding Corporation's Federal income tax:

| Tax Year Ended | Deficiency |
| --- | --- |
| September 30, 1993 | $1,566,852 |
| September 30, 1994 | 86,973 |
| September 30, 1995 | 245,644 |

After concessions,[2] the sole issue for decision is what portion, if any, of the consideration paid by Becker Holding Corporation (BHC) to R. William Becker (William Becker) in redemption of William Becker's stock in BHC should be allocated to a covenant not to compete.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact and the attached exhibits are incorporated herein by this reference.  At the time the petitions were filed, William and Mary Ann Becker resided in Vero Beach,

---

[1]  Amounts are rounded to the nearest dollar.

[2]  In a Stipulation of Settled Issues, filed Jan. 9, 2006, in docket No. 6400-03, petitioner Becker Holding Corporation and Subsidiaries (BHC) and respondent agreed to various adjustments to BHC's Federal income tax liability for the tax years ended Sept. 30, 1993, 1994, and 1995.

Florida, and BHC was a Florida corporation with its principal place of business located in Ft. Pierce, Florida.

Richard E. Becker (Mr. Becker) and the Becker family have been engaged in various aspects of the Florida citrus industry since at least the 1950s. On December 28, 1983, BHC was incorporated by Mr. Becker for purposes of estate planning and the continuation of the family business.

Mr. Becker was the father of William Becker, Barbara Hurley, and Jo Ann Becker. William Becker was well known in the citrus industry. He was appointed by the Governor of Florida to two consecutive 3-year terms on the Florida Citrus Commission and was elected chairman of the commission for 5 consecutive years.[3]

As of February 22, 1991, Mr. Becker was BHC's chairman of the board, William Becker was BHC's chief operating officer and ran its day-to-day operations, and Barbara Hurley and Jo Ann Becker had limited involvement in BHC. As of February 22, 1991, BHC's stock was owned as follows:

---

[3] The Florida Citrus Commission consists of 12 members appointed by the Governor of Florida, meets on a monthly basis, and oversees and guides the activities of the Department of Citrus. The Department of Citrus carries out the Florida Citrus Commission policy and acts as the commission's staff by conducting a wide variety of programs involving marketing research and regulation.

| Shareholder | Class A voting preferred stock | Class B nonvoting preferred stock | Nonvoting common stock |
|---|---|---|---|
| Richard E. Becker | 3 | -0- | -0- |
| Richard E. Becker Revocable Trust | 860 | -0- | -0- |
| Richard E. Becker Living Trust | -0- | 4,500 | -0- |
| Lillian M. Becker[1] Living Trust | -0- | 3,281 | -0- |
| William Becker[2] | 1 | 256 | 1,000 |
| Barbara Hurley | 1/2 | 36 | 500 |
| Jo Ann Becker | 1/2 | 36 | 500 |
| Total | 865 | 8,109 | 2,000 |

[1] Lillian M. Becker was the wife of Mr. Becker.

[2] William Becker had only a life estate in his single share of Class A voting preferred stock.

Family disputes regarding the management and control of BHC ultimately resulted in the termination of William Becker's employment with BHC on February 22, 1991. Over the next 3 weeks, negotiations took place between William Becker, Mr. Becker, Richard Neill (Mr. Neill) as attorney for BHC, and Daniel Dempsey (Mr. Dempsey) as BHC's chief financial officer, for the redemption of William Becker's stock in BHC.[4] Mr. Neill drafted an agreement and encouraged William Becker to obtain independent

---

[4] Mr. Dempsey acted as an intermediary between Mr. Becker and William Becker but did not advise anyone as to the terms or contents of the agreements.

legal representation.  On March 14, 1991, William Becker hired an attorney, Frank J. Reif (Mr. Reif).  Mr. Reif read the agreement drafted by Mr. Neill, did not suggest any changes, and advised William Becker to sign the document.

On March 15, 1991, BHC and William Becker entered into an agreement (redemption agreement), which stated in part:

> NOW, THEREFORE, in consideration of the mutual promises and covenants hereinafter set forth, it is agreed by and between R. WILLIAM BECKER as Seller and BECKER HOLDING CORPORATION as Buyer as follows:
>
> 1.  <u>PRICE</u>:  Seller will sell and Buyer will purchase Seller's entire common stock[5] of BECKER HOLDING CORPORATION consisting of 1,000 shares of $1.00 par at and for a purchase price of Twenty-three Million Nine Hundred Fifty-Three Thousand Nine Hundred Thirty-four Dollars ($23,953,934.00), together with interest at the rate of 10% per annum on the unpaid balance, the same to be payable:  * * *
>
> 2.  <u>CLOSING AND TERMS</u>:  The closing of this transaction shall occur on April 1, 1991, at which time Buyer will pay to Seller the down payment of $5,000,000 and will execute and deliver a promissory note for the balance of the purchase price payable as set forth above.  The promissory note shall be secured by a pledge of the Seller's common stock.
>
> 3.  <u>TERMINATION</u>:  Seller's employment with Buyer was terminated as of February 22, 1991, and Seller's authority to act on behalf of the corporation terminated as of that date.  Seller shall be entitled to salary accruing to February 22, 1991.  Seller has vacated his personal office at Buyer's headquarters and represents and

---

[5]  William Becker also owned shares of preferred stock which were included in the sale.  There is no dispute that all BHC stock he owned, or had a beneficial interest in, was redeemed.

warrants that he has removed therefrom his personal effects only and all files, documents, data, and any information whatever pertaining to the business of the Buyer will remain the property of the Buyer and will remain on the Buyer's premises.

*    *    *    *    *    *    *

6.  COMPETITION:  The Seller, R. William Becker, will be free to engage in any and all aspects of the citrus industry, including the growing, picking, and packing of citrus fruit, except that, for a period of three (3) years from closing, Seller shall not directly or indirectly engage in the processing or sale of citrus concentrate or fresh juices; provided further, Seller covenants and agrees that he will not solicit the company's existing customers or in any way interfere with the Company's presently-existing business relationships, nor will he provide to any person, firm or corporation any information concerning the present business of BECKER HOLDING CORPORATION that is not public knowledge, including without limitation, the terms of said Company's agreement with Coca-Cola Company or its subsidiaries, the Company's customer lists, the Company's marketing strategy, the Company's financial data, or other internal marketing or production information of BECKER HOLDING CORPORATION.  The Seller will not in any way take any action that would lead to impairment of the Buyer's currently-existing banking relationships.
*  *  *

At the closing on April 1, 1991, BHC paid William Becker $5 million as a downpayment.  BHC also executed a promissory note for $18,953,934, payable to William Becker, requiring annual payments of $5 million per year, including interest, on the first day of April each year up to and including April 1, 1996.  The promissory note stated in part that "This note is issued pursuant to that certain Agreement dated March 15, 1991, by and between

[BHC] and [William Becker] with respect to the redemption of the [William Becker]'s stock by [BHC]." The promissory note also contained the following provision:

> The terms and conditions of the Redemption Agreement are hereby incorporated into this Note. The Maker shall have the right of offset against amounts due and the right to defer or suspend payments due under this Note based on any breach by the Holder of the covenants contained in Section 6 of the Redemption Agreement.

The transaction was further evidenced by a pledge and escrow agreement which stated in part:

> WHEREAS, BECKER HOLDING CORPORATION, by Agreement dated March 15, 1991, has agreed to purchase from R. WILLIAM BECKER at and for a purchase price of $23,953,934.00 all of the Corporation's common and preferred stock owned by him; and
>
> WHEREAS, a portion of the purchase price is represented by a promissory note, (hereafter "NOTE") and the parties desire to secure payment of the same,
>
> NOW, THEREFORE, in consideration of the payments, covenants and promises set forth in the aforesaid Agreement, and other good and valuable consideration, it is agreed by and between BECKER HOLDING CORPORATION * * * and R. WILLIAM BECKER * * * as follows:
>
> 1. The covenants, promises and agreements set forth in the Stock Purchase Agreement of March 15, 1991, and in particular Paragraphs 6, 7, and 8 thereof, shall survive the closing and continue binding upon the parties.

As with the redemption agreement, Mr. Neill also drafted

the promissory note and the pledge and escrow agreement.[6]  Mr. Reif suggested several changes to the promissory note and the pledge and escrow agreement, but none of the changes were made and the documents were executed as originally drafted by Mr. Neill.

No formal appraisals determining the value of BHC or its stock were made prior to the signing of the purchase documents. Mr. Becker and William Becker fixed the price themselves.  There was no discussion at the time of the sale about allocating any portion of the consideration to the covenant not to compete.

In the fall of 1991, William Becker's accountant, Richard Lynch (Mr. Lynch), informed William Becker that BHC missed tax advantage opportunities by not allocating any portion of the consideration to the covenant not to compete.  Mr. Lynch suggested that William Becker meet with Mr. Dempsey (BHC's chief financial officer) to discuss the possible allocation of a portion of the purchase price to the covenant not to compete in exchange for additional consideration or a shorter noncompete period.  In February 1992, William Becker and Mr. Lynch met with BHC, Mr. Dempsey, and an accountant for BHC to discuss redrafting the purchase documents.  However, the discussions terminated, and no agreement was reached.

---

[6]  We refer to the redemption agreement, the promissory note, and the pledge and escrow agreement collectively as the "purchase documents".

BHC refused to pay to William Becker the $5 million installment due April 1, 1992, because of its claim that William Becker had materially breached the covenant not to compete. On March 19, 1992, BHC filed a complaint against William Becker in the United States District Court for the Southern District of Florida alleging, among other things, breach of contract. On April 13, 1992, William Becker filed a counterclaim for the accelerated payment of amounts owed to him under the purchase documents. On March 7, 1994, the Federal District Court found the covenant not to compete to be valid but also found that there was no material breach and held for William Becker on his counterclaim. Becker Holding Corp. v. Becker, No. 92-14057-CIV-JCP (S.D. Fla. 1994). BHC appealed the decision and, on March 27, 1996, the Court of Appeals for the Eleventh Circuit (Eleventh Circuit) affirmed the District Court's judgment in favor of William Becker, reversing and remanding to adjust the damage award for prejudgment interest. Becker Holding Corp. v. Becker, 78 F.3d 514 (11th Cir. 1996). On May 22, 1996, BHC paid $27,200,784 to William Becker in satisfaction of the entire judgment.

Mr. Lynch prepared William and Mary Ann Becker's Federal income tax return for 1991. Due to the litigation then pending in the Federal District Court, in which BHC sought to recover the $5 million paid to William Becker in 1991, William Becker wanted

to delay the recognition of income on that payment. Mr. Lynch suggested treating the payment as an "option contract", and thus delay recognition of income on the payment. William and Mary Ann Becker timely filed a Federal income tax return for 1991, did not report the $5 million payment as taxable income, and attached a "disclosure statement" explaining Mr. Lynch's "option contract" theory. In 1994, William and Mary Ann Becker were audited, respondent rejected their treatment of the $5 million payment, and they paid their Federal income tax deficiency in full.

On its Federal consolidated corporate income tax return for the taxable year ended September 30, 1991, BHC claimed an amortization deduction of $1,061,833 based on a reported basis of $6,371,000 for the covenant not to compete. Neither BHC's tax return for the taxable year ended September 30, 1991, nor William and Mary Ann Becker's tax return for 1991 is at issue in this case.

On their Federal income tax return for 1996, William and Mary Ann Becker treated the payment received from BHC on May 22, 1996, as capital gain attributable to the sale of William Becker's stock in BHC. On June 4, 2002, respondent issued a notice of deficiency determining a deficiency of $615,681 for 1996. The deficiency was the result of respondent's determination that William Becker must recognize $5,307,600 of the payment received from BHC as ordinary income attributable to

the covenant not to compete.  William and Mary Ann Becker filed a petition with this Court on August 26, 2002, seeking a redetermination of the deficiency.

On its Federal consolidated corporate income tax return for the taxable year ended September 30, 1996, BHC claimed an amortization deduction of $5,307,600 attributable to the covenant not to compete.  As a result of this and other deductions, BHC generated a net operating loss in 1996 and filed a Form 1139, Corporation Application for a Tentative Refund, to carry back that loss to its taxable years ended September 30, 1993, September 30, 1994, and September 30, 1995.  On January 30, 2003, respondent issued a notice of deficiency disallowing, inter alia, BHC's amortization deduction taken in 1996.  Respondent determined deficiencies in BHC's Federal income tax of $1,566,852, $86,973, and $245,644, respectively, for BHC's taxable years ended September 30, 1993, September 30, 1994, and September 30, 1995.  BHC filed a petition with this Court on April 29, 2003, seeking a redetermination of the deficiencies.

## OPINION

William Becker and BHC have divergent views regarding the characterization of the transaction under review and its tax consequences.  William Becker contends that the total consideration paid under the purchase documents is attributable to his corporate stock in BHC, a capital asset, resulting in

long-term capital gain. See secs. 1221, 1222, 1223.[7] If this characterization were carried over to BHC's income tax return, BHC would have, for the tax years involved, no amortization deduction because it would not be acquiring an amortizable asset.

BHC contends that it purchased not only the corporate stock, but also a covenant not to compete, and that at least $5,307,600 of the consideration paid in 1996 should be allocated to the covenant, resulting in an amortization deduction for that year.[8] If this characterization of the transaction were carried over to William Becker's individual income tax return for 1996, he would have to include the portion of the consideration received attributable to the covenant not to compete as ordinary income. See Sonnleitner v. Commissioner, 598 F.2d 464, 466 (5th Cir. 1979), affg. T.C. Memo. 1976-249; Montesi v. Commissioner, 340 F.2d 97, 100 (6th Cir. 1965), affg. 40 T.C. 511 (1963); Jorgl v. Commissioner, T.C. Memo. 2000-10, affd. per curiam without published opinion 264 F.3d 1145 (11th Cir. 2001).

---

[7] Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[8] See sec. 1.167(a)-3, Income Tax Regs. Sec. 197, requiring amortization of a covenant not to compete ratably over the 15-year period beginning with the month in which the intangible was acquired is applicable, if an appropriate election is made, for acquisitions after July 25, 1991. See Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, sec. 13261(g)(2) and (3), 107 Stat. 540, as amended by the Small Business Job Protection Act of 1996, Pub. L. 104-188, sec. 1703(l), 110 Stat. 1875.

Respondent asserted protective deficiencies against both William Becker and BHC, alternatively disagreeing with each party's characterization of the transaction, in order to avoid being "whipsawed" by alternative versions of the same transaction. After consolidation of the cases for a determination of the issue, respondent has agreed with the characterization of the transaction proposed by William Becker, reserving the right to reverse his position should the Court hold for BHC.

## I.   Relevant Caselaw

Courts have used a variety of rules to analyze transactions of the type at issue in this case, including the strong proof rule, the mutual intent test, and the Danielson rule. See, e.g., Better Beverages, Inc. v. United States, 619 F.2d 424, 430 (5th Cir. 1980); Commissioner v. Danielson, 378 F.2d 771, 773 (3d Cir. 1967); Ullman v. Commissioner, 264 F.2d 305 (2d Cir. 1959), affg. 29 T.C. 129 (1957). The instant case would be appealable to the Court of Appeals for the Eleventh Circuit, barring a stipulation otherwise. The Tax Court will generally defer to the rule adopted by the Court of Appeals for the circuit to which appeal would normally lie, if that Court of Appeals has ruled with respect to the identical issue. See Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). The Court of Appeals for the Eleventh Circuit has held that any

case decided by Court of Appeals for the Fifth Circuit (Fifth Circuit) prior to October 1, 1981, will be binding precedent upon it.  See Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981).  Therefore, we review the caselaw in both the Fifth Circuit and Eleventh Circuit in making our determinations herein.

A.    The Strong Proof Rule and the Mutual Intent Test

When first considering tax allocations in cases involving covenants not to compete, the Fifth Circuit adopted the "strong proof" rule set out in Ullman v. Commissioner, supra at 308, to wit:

> when the parties to a transaction * * * have specifically set out the covenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome the declaration. * * *

See, e.g., Sonnleitner v. Commissioner, 598 F.2d 464, 467 (5th Cir. 1979), affg. T.C. Memo. 1976-249; Dixie Fin. Co. v. Commissioner, 474 F.2d 501, 505 (5th Cir. 1973), affg. Stewart v. Commissioner, T.C. Memo. 1971-114; Balthrope v. Commissioner, 356 F.2d 28, 31 (5th Cir. 1966), affg. T.C. Memo. 1964-31; Barran v. Commissioner, 334 F.2d 58, 63 (5th Cir. 1964), affg. in part and revg. in part 39 T.C. 515 (1962).

However, in 1980, the Fifth Circuit departed from the "strong proof" rule.  In Better Beverages, Inc. v. United States, supra at 425, the Fifth Circuit adopted a mutual intent test, citing Annabelle Candy Co. v. Commissioner, 314 F.2d 1 (9th Cir.

1963), affg. T.C. Memo. 1961-170, as the "seminal case" on the subject.

In Annabelle Candy Co., a dispute arose between the two stockholders of Annabelle Candy Company (Annabelle Candy), which resulted in one stockholder's selling his stock to the corporation. Annabelle Candy Co. v. Commissioner, supra at 2-3. The agreement provided that the stockholder would be paid $115,000 over a period of time and included a covenant not to compete. Id. at 3. The agreement made no allocation of any portion of the total consideration to the covenant, and there were no discussions prior to the signing of the agreement concerning the allocation of a portion of the purchase price to the covenant. Id. Subsequent to the signing of the agreement, Annabelle Candy unilaterally allocated a portion of the purchase price to the covenant not to compete without the consent of the stockholder and amortized the allocated portion on its corporate tax return. Id. at 4. The Court of Appeals for the Ninth Circuit (Ninth Circuit) stated:

> In the purchase agreement involved in the case before us, there is no allocation of consideration to the covenant not to compete. While this is pretty good evidence that no such allocation was intended it is not conclusive on the parties as would be the case if there had been an express affirmance or disavowal in the agreement. * * * It is true * * * that the covenant not to compete played a very real part in the negotiation of a final contract between the parties, and was a valuable benefit to the petitioner. But if the parties did not intend that a purchase price be

> <u>allocated</u> to this important and valuable covenant, <u>that intention must be respected</u>. * * *

>        *    *    *    *    *    *    *

> Did the parties, not preliminarily, but <u>when they signed the agreement</u>, <u>intend to allocate a portion of the purchase price to the covenant not to compete</u>?

<u>Id.</u> at 7-8 (emphasis added).

In <u>Better Beverages, Inc. v. United States</u>, <u>supra</u> at 425, Better Beverages purchased the assets of a soft drink business located in Victoria, Texas. A letter of intent signed by the parties fixed a purchase price of $400,000 for all of the assets of the selling company, except real estate and office equipment. <u>Id.</u> at 426. The letter of intent made no mention of a covenant not to compete and did not allocate, for income tax purposes, the $400,000 among the various assets. <u>Id.</u> Approximately 3 weeks after the letter of intent was signed, the parties consummated the transaction by use of a bill of sale whose terms were consistent with the letter of intent except, inter alia, it included a covenant not to compete for 10 years. <u>Id.</u> at 427. The purchase price remained the same and remained unallocated among the various assets. <u>Id.</u>

Better Beverages thereafter unilaterally allocated $244,547 to the covenant not to compete and amortized that amount on its tax returns. <u>Id.</u> The seller of the soft drink business made no allocation to the covenant not to compete, treating its gain as gain from the sale of capital assets. <u>Id.</u> The Internal Revenue

Service asserted protective deficiencies against both parties. Id. at 426.

The Federal District Court granted summary judgment in favor of the seller of the business treating the gain as gain from the sale of capital assets and rejected Better Beverages' unilateral allocation in the absence of any evidence that both parties agreed to the allocation.  Id. at 426-427.  The Fifth Circuit affirmed the District Court, stating:

> our rejection of Better Beverages' unilateral assertions of value as an inadequate indicator of actual cost basis is wholly consistent with the trend among other courts, in cases like this one, to require the buyer to prove that the parties mutually intended at the time of the sale that some portion of the lump sum consideration be allocated to the seller's covenant not to compete.  * * *  the most efficacious method and, ordinarily, the only truly reliable and practicable way for a purchaser to satisfy his burden in a case like this one is by proof of the parties' specific agreement, expressed or implied, to allocate some portion of the lump sum purchase price to the covenant * * *.  Better Beverages cannot travel this smooth road, however.  * * * Better Beverages conceded not only that no agreement had ever been reached regarding allocation of some portion of the price to the covenant, but also that such a price or allocation apparently never had been discussed by the parties.
>
> The ultimate inquiry is * * * what, if any, portion of the lump sum price actually was exchanged for the covenant * * *.

Id. at 430-431 (emphasis added).

The Eleventh Circuit has never explicitly addressed the mutual intent test set forth in Annabelle Candy Co. and adopted by the Fifth Circuit in Better Beverages, Inc.  However, because

Better Beverages, Inc. was decided before October 1, 1991, it is
binding precedent in the Eleventh Circuit.  See Bonner v. City of
Prichard, 661 F.2d at 1207.  Additionally, the Tax Court applied
the mutual intent test in Jorgl, which was affirmed by the
Eleventh Circuit in an unpublished per curiam opinion.  See Jorgl
v. Commissioner, T.C. Memo. 2000-10.  In Jorgl, we stated that we
would not apply the strong proof rule or the Danielson rule, see
infra, when a contract failed to make an allocation of purchase
price to a covenant not to compete or did so in an ambiguous
manner.  Jorgl v. Commissioner, supra.  Instead, we stated that
the taxpayer must establish, by a preponderance of evidence, that
respondent's deficiency determination is erroneous, with the
threshold inquiry being "whether the parties mutually intended
that an allocation of the purchase price be made to the covenant
at issue", citing Better Beverages Inc. v. United States, supra
at 430.  Id.   If such mutual intent is found,

> courts then proceed to evaluate whether an allocation
> comports with "economic reality".  * * *  An allocation
> will generally be given effect where "the covenants had
> independent economic significance such that * * * [the
> Court] might conclude that they were a separately
> bargained-for element of the agreement."

Jorgl v. Commissioner, supra (quoting Peterson Mach. Tool, Inc.
v. Commissioner, 79 T.C. 72, 81 (1982), affd. 54 AFTR 2d 84-5407,
84-2 USTC par. 9885 (10th Cir. 1984)).

B.    The Danielson Rule

In Commissioner v. Danielson, 378 F.2d 771, 773 (3d Cir. 1967), Thrift Investment Corporation (Thrift) offered to buy all the common stock owned by individual stockholders, including Danielson, for $374 per share.  In the agreement of sale, Thrift allocated $152 per share to a covenant not to compete and $222 per share to the contract for the sale of stock.  Id.  On each payment check, Thrift printed a notation that the payment represented a payment for both the stock and the covenant not to compete.  Id.  On their tax returns, Danielson and the other stockholders reported the payments received as income from the sale of a capital asset.  Id.  The Court of Appeals for the Third Circuit held:

> a taxpayer who enters into a transaction of this type
> to sell his shares and executes a covenant not to
> compete for a <u>consideration specifically allocated to
> the covenant may not, absent a showing of fraud, undue
> influence and the like on the part of the other party,
> challenge the allocation for tax purposes</u>.  We so
> conclude even though the evidence, as here, would
> support finding that the explicit allocation had no
> independent basis in fact or arguable relationship with
> business reality. * * *

Id. at 777 (emphasis added).  The Danielson rule, as adopted by the Third Circuit, is:

> a party can challenge the tax consequences of his
> agreement as construed by the Commissioner only by
> adducing proof which in an action between the parties

to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc.

Id. at 775.

Prior to October 1, 1991, the Fifth Circuit adopted the Danielson rule in Spector v. Commissioner, 641 F.2d 376 (5th Cir. 1981), revg. 71 T.C. 1017 (1979). See Bonner v. City of Prichard, supra at 1207. The Eleventh Circuit has also explicitly adopted the Danielson rule. Bradley v. United States, 730 F.2d 718, 720 (11th Cir. 1984) (affirming a District Court holding that payments received were interest income pursuant to a sale rather than an option to purchase because the contract called for interest payments); see also Thomas v. Commissioner, 67 Fed. Appx. 582 (11th Cir. 2003) (affirming, inter alia, that the taxpayers were bound by the allocation to the covenant not to compete contained in a stock purchase agreement), affg. T.C. Memo. 2002-108; Plante v. Commissioner, 168 F.3d 1279 (11th Cir. 1999) (affirming that the taxpayer was not entitled to a bad debt deduction and associated carryover losses because stock purchase agreement was unambiguous that advances were capital contributions and not debt), affg. T.C. Memo. 1997-386.

C.   Positions of the Parties

William Becker and respondent contend that the Danielson rule controls. They argue that, because the purchase documents unambiguously allocate the entire consideration paid in the

transaction to the stock sold, the transaction should result in capital gain to William Becker with nothing allocable to the covenant not to compete.

BHC contends that the Danielson rule does not apply because the purchase documents are ambiguous as to an allocation of the consideration between the stock and the covenant not to compete. BHC argues that the mutual intent test set forth in Better Beverages controls. BHC argues that, because the parties mutually intended to allocate a portion of the consideration to the covenant not to compete, the Court should make an independent determination of the economic value of the covenant.

William Becker and respondent counter that, even if the Danielson rule does not apply, none of the consideration is allocable to the covenant not to compete because there was no mutual intent to make such an allocation.

Regardless of whether we apply the Danielson rule or the mutual intent test set forth in Better Beverages, the result is the same. For the reasons discussed below, we find that none of the consideration paid by BHC to William Becker is allocable to the covenant not to compete.

II.  Analysis Under the Danielson Rule

Under the Danielson rule, William Becker and BHC will be bound to the unambiguous allocations in the purchase documents, absent a showing of mistake, undue influence, fraud, duress, etc.

Commissioner v. Danielson, supra at 777-779.  BHC does not argue
that the purchase documents are unenforceable due to mistake,
undue influence, fraud, duress, etc.  Instead, BHC argues that
the Danielson rule does not apply because the purchase documents
are ambiguous as to an allocation of the consideration between
the stock and the covenant not to compete.  Contrary to BHC's
argument, the purchase documents repeatedly reflect the
unambiguous allocation of the entire $23.9 million of
consideration to William Becker's stock.

The Redemption Agreement clearly allocates the entire $23.9
million of consideration to William Becker's stock, stating:

> 1.  PRICE:  Seller will sell and Buyer will
> purchase Seller's entire common stock of BECKER HOLDING
> CORPORATION consisting of 1,000 shares of $1.00 par at
> and for a purchase price of Twenty-three Million Nine
> Hundred Fifty-Three Thousand Nine Hundred Thirty-four
> Dollars ($23,953,934.00), together with interest at the
> rate of 10% per annum on the unpaid balance * * *
> [Emphasis added.]

Likewise, the pledge and escrow agreement provides:

> WHEREAS, BECKER HOLDING CORPORATION, by agreement dated
> March 13, 1991, has agreed to purchase from R. WILLIAM
> BECKER at and for a purchase price of $23,953,934.00
> all of the Corporation's common and preferred stock
> owned by him. [Emphasis added.]

While the promissory note does not explicitly state that 100
percent of the consideration is being paid for William Becker's
stock, as do the other purchase documents, it does provide that
"This note is issued pursuant to that certain Agreement dated
March 15, 1991, by and between [BHC] and [William Becker] with

respect to the redemption of [William Becker]'s stock by [BHC]."
This provision indicates that the promissory note was given for
William Becker's stock, not for the covenant not to compete.

In an attempt to overcome the clear language of the purchase
documents, BHC raises several arguments, none of which are
persuasive. First, BHC argues that "No specific amount was
mutually allocated to the covenant". BHC is correct in asserting
that the purchase documents do not explicitly state that zero
dollars are being allocated to the covenant not to compete.
However, the purchase documents repeatedly reflect the express
allocation of the entire $23.9 million of consideration to
William Becker's stock. As a matter of simple arithmetic, no
portion of the consideration is left over to allocate to the
covenant not to compete.

Second, BHC argues that the "in consideration" clauses in
the redemption agreement and in the pledge and escrow agreement
are "determinative of the issue of ambiguity". BHC cites
Patterson v. Commissioner, 810 F.2d 562 (6th Cir. 1987), affg.
T.C. Memo. 1985-53, in support of its position. In Patterson,
the Court of Appeals for the Sixth Circuit (Sixth Circuit)
declined to apply the Danielson rule because the sales agreement
did not contain an unambiguous allocation with respect to the
purchase price. The Sixth Circuit noted the following language
in the sales agreement: "As consideration for part of the

<u>purchase price</u>

* * * Patterson agrees, simultaneously with the execution of this Agreement, <u>to enter into a Covenant Not to Compete</u> in the form attached hereto".  <u>Id.</u> at 567 (emphasis added).  As the above-emphasized language indicates, the "in consideration" clause in <u>Patterson</u> expressly tied the covenant not to compete to part of the purchase price at issue.  See <u>id.</u>

In contrast, the purchase documents in this case do not tie part of the consideration to the covenant not to compete.  The redemption agreement provides that "in consideration of the mutual promises and covenants hereinafter set forth, it is agreed by and between R. WILLIAM BECKER as Seller and BECKER HOLDING CORPORATION as Buyer as follows".  This clause does not tie a portion of the consideration to the covenant not to compete, and it does not create an ambiguity in the purchase documents.  Instead, it simply indicates that each of the numbered paragraphs of the redemption agreement is a part of the overall transaction, including paragraph one setting forth the purchase price and paragraph six containing the covenant not to compete.  The pledge and escrow agreement provides that "in consideration of the payments, covenants and promises set forth in the aforesaid Agreement * * * it is agreed by and between BECKER HOLDING CORPORATION * * * and R. WILLIAM BECKER * * * as follows".  Like the "in consideration" clause in the redemption agreement, this

clause does not tie a portion of the purchase price to the covenant not to compete, and it does not create an ambiguity in the purchase documents.

Third, BHC argues that, because the redemption agreement fails to mention William Becker's preferred stock, the purchase documents are ambiguous. The redemption agreement refers only to William Becker's common stock and not to his preferred stock. However, it is undisputed that the parties to the transaction intended the purchase documents to cover all of William Becker's stock, not just the common stock, and in fact all of his stock was redeemed. Additionally, the pledge and escrow agreement supports the intention of the parties by referring to both William Becker's common stock and his preferred stock. The failure of the redemption agreement to include explicitly William Becker's preferred stock does not render ambiguous the explicit allocation of the entire $23.9 million of consideration to his stock, both common and preferred.

Finally, BHC argues that the parties' failure to obtain a formal valuation of William Becker's stock evinces ambiguity. BHC's argument is without merit. BHC and William Becker clearly agreed that BHC would purchase William Becker's stock for $23.9 million, which indicates that the parties themselves valued the stock at $23.9 million. The absence of a third-party appraiser does not render the purchase documents ambiguous.

We conclude that the purchase documents unambiguously allocated 100 percent of the consideration to William Becker's stock in BHC.

III. Analysis Under the Mutual Intent Test

The threshold question under the mutual intent test is whether, at the time the purchase documents were executed, BHC and William Becker mutually intended to allocate a portion of the consideration to the covenant not to compete.[9] Better Beverages, Inc. v. United States, 619 F.2d 424, 429-430 (5th Cir. 1980); Jorgl v. Commissioner, T.C. Memo. 2000-10. BHC argues that the "parties mutually intended to allocate consideration to the covenant." To the contrary, William Becker, Mr. Neill, and Mr. Dempsey all testified that, prior to the execution of the purchase documents, there were no discussions regarding the allocation of a portion of the consideration to the covenant not to compete. Likewise, during his deposition, Mr. Becker testified that "nor was there ever any discussion about allocation. You keep using that word allocation, that was never a thought in my mind or was never a consideration in the whole

---

[9] Because we find that there was no mutual intent to allocate a portion of the consideration to the covenant not to compete, as discussed infra, we need not determine whether the covenant had independent economic significance, was separately bargained for, or what its economic value was at the time the purchase documents were executed. See Better Beverages, Inc. v. United States, 619 F.2d 424, 430-431 (5th Cir. 1980); Jorgl v. Commissioner, T.C. Memo. 2000-10, affd. per curiam without published opinion 264 F.3d 1145 (11th Cir. 2001).

deal. It was an afterthought from an accountant's standpoint."[10] The testimony of those involved with the transaction, coupled with the purchase documents' explicit allocation of 100 percent of the consideration to William Becker's stock, as described supra, clearly demonstrates that there was no mutual intent to allocate a portion of the consideration to the covenant not to compete.

Despite the testimony and the clear language of the purchase documents, BHC raises several arguments to support its contention that the parties mutually intended to allocate a portion of the consideration to the covenant not to compete, none of which are persuasive. First, BHC argues that the importance of the covenant to BHC is evidence of the parties' mutual intent. The record is replete with facts establishing the importance of the covenant not to compete to BHC and William Becker's knowledge of its importance to BHC. However, the importance of the covenant not to compete does not demonstrate mutual intent to allocate a portion of the consideration to the covenant. As stated by the Court of Appeals for the Ninth Circuit in Annabelle Candy Co. v. Commissioner, 314 F.2d at 7:

> It is true * * * that the covenant not to compete
> played a very real part in the negotiation of a final
> contract between the parties, and was a valuable

---

[10] Pursuant to Rule 81(a), Mr. Becker's deposition to perpetuate testimony was taken on Mar. 4 and 5, 2004. Mr. Becker died on Mar. 29, 2005.

benefit to the petitioner. But if the parties did not intend that a purchase price be allocated to this important and valuable covenant, that intention must be respected. * * *

Second, BHC argues that the promissory note represented an economic allocation of a portion of the consideration to the covenant not to compete. This is not an accurate interpretation of the promissory note. The promissory note contained an offset provision whereby, if William Becker violated the covenants contained in the redemption agreement, BHC could offset the amount owed to William Becker by the actual damages caused to BHC. This does not reflect the mutual intent of the parties to allocate a portion of the consideration paid to the covenant not to compete.

Third, BHC argues that the discussions held from the fall of 1991 through February 1992 demonstrate the parties' mutual intent. During those discussions, the parties contemplated allocating a portion of the consideration to the covenant not to compete in exchange for additional consideration. These discussions took place at least 6 months after the transaction and do not reflect the mutual intent of the parties at the time the purchase documents were executed.

Fourth, BHC argues that the disclosure statement attached to William Becker's 1991 Federal income tax return demonstrates the parties' mutual intent. At the suggestion of Mr. Lynch, William Becker took a position on that return in an attempt to avoid

recognition of income on the $5 million received from BHC in 1991 due to the fact that BHC had filed suit against William Becker and was seeking to recover that money.  Mr. Lynch testified that he knew the position was a weak one at the time the return was filed, and that this was the reason a disclosure statement was attached.  The 1991 return and the attached disclosure statement demonstrate an attempt to defer recognition of income; they do not demonstrate mutual intent to allocate a portion of the consideration to the covenant not to compete.

BHC also cites Peterson Mach. Tool, Inc. v. Commissioner, 79 T.C. 72, 81 (1982), Jorgl v. Commissioner, supra, and Ansan Tool & Manufacturing Co. v. Commissioner, T.C. Memo. 1992-121, in support of its assertion that "BHC meets the mutual intent test". However, Peterson and Jorgl are factually distinguishable, and Ansan Tool applied a standard different from the standard applicable in this case.

In Peterson, the contract explicitly provided that the lump-sum purchase price was for both stock and a covenant not to compete, and the contract expressly provided that "the covenants are a material portion of the purchase price."  Peterson Mach. Tool, Inc. v. Commissioner, supra at 77, 82-83.  In Jorgl, the parties' closing agreement explicitly provided that $300,000 of the $650,000 total purchase price was being paid for a covenant. Jorgl v. Commissioner, supra.  In both cases, the courts found

that the parties mutually intended to allocate a portion of the purchase price to the covenants.  Peterson Mach. Tool, Inc. v. Commissioner, supra at 83-84; Jorgl v. Commissioner, supra. Unlike Peterson and Jorgl, the purchase documents in this case do not explicitly allocate a portion of the consideration to the covenant not to compete, but instead explicitly allocate 100 percent of the consideration to William Becker's stock.  Peterson and Jorgl do not support BHC's contention that the parties mutually intended to allocate a portion of the consideration to the covenant not to compete.

In Ansan Tool, the Tax Court utilized a test that is not applicable in the Eleventh Circuit, stating:  "The Seventh Circuit, to which an appeal in this case would lie, looks to all the evidence pertinent to the covenant to determine if it has independent value and, if it does, to determine how much the covenant is worth."  Ansan Tool & Manufacturing Co. v. Commissioner, supra.  The Tax Court then determined that, because the covenant not to compete had independent economic value, a portion of the purchase price was allocable to it.  Id.  Under the mutual intent test, the question is not whether the covenant not to compete had independent economic value, but whether "the parties mutually intended at the time of the sale that some portion of the lump sum consideration be allocated to the seller's covenant not to compete".  Better Beverages, Inc. v.

<u>United States</u>, <u>supra</u> at 430. Because the Court did not apply the standard applicable in this case, <u>Ansan Tool</u> has no bearing on our determination.

Unlike the cases cited by BHC, we find the facts in this case to be substantially similar to the facts in <u>Annabelle Candy Co. v. Commissioner</u>, <u>supra</u>: (1) The transaction involved a stock sale and the agreement included a covenant not to compete; (2) there were no discussions about allocation of the price to the covenant prior to or at the time the agreement was signed; (3) the agreement did not allocate any portion of the price to the covenant; and (4) after the agreement was signed, one party made a unilateral allocation of a portion of the price to the covenant. <u>Annabelle Candy Co. v. Commissioner</u>, 314 F.2d at 2-4. Similar to the holding in that case and for all of the above-stated reasons, we find that there was no mutual intent to allocate a portion of the consideration to the covenant not to compete.

## IV. <u>Conclusion</u>

The purchase documents explicitly and unambiguously allocate the entire $23.9 million of consideration to William Becker's stock. See <u>Commissioner v. Danielson</u>, 378 F.2d 771, 779 (3d Cir. 1967). At the time the purchase documents were executed, there was no mutual intent to allocate a portion of the consideration to the covenant not to compete. See <u>Better Beverages, Inc. v.</u>

<u>United States</u>, <u>supra</u> at 430-431.  Therefore, we conclude that 100 percent of the consideration paid by BHC to William Becker is allocable to the purchase of William Becker's stock, and none of the consideration is allocable to the covenant not to compete.

In reaching our holdings, we have considered all arguments and contentions made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing and the concessions of the parties in docket No. 6400-03,

<u>Decision will be entered for petitioners in docket No. 13725-02, and decision will be entered under Rule 155 in docket No. 6400-03</u>.